Filed 6/23/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| AMERICAN INDIAN MODEL SCHOOLS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> OAKLAND UNIFIED SCHOOL DISTRICT et al., <br><br> Defendants and Appellants. | A139652 <br><br> (Alameda County <br> Super. Ct. No. RG13680906) |


The American Indian Model Schools (AIMS) operates three public charter schools in the City of Oakland (Oakland). The Oakland Unified School District (the District) decided to revoke AIMS's three charters after an independent audit uncovered evidence of conflict of interest violations, fiscal mismanagement, and improper use of public funds at the three charter schools. Funding of the charter schools was to halt while AIMS appealed the revocation decision.

AIMS filed a writ petition in the superior court against the District and others (collectively, defendants),[1] challenging the District's revocation of its charters. AIMS also requested a preliminary injunction to stop the implementation of the revocation order during the appeal process.

The trial court granted in part AIMS's request for a preliminary injunction. The court highlighted the outstanding scholastic achievements of the students at AIMS's three

---

[1] The defendants are the District, the Governing Board of the Oakland Unified School District (the District's Board), District Superintendent Tony Smith, and Acting District Superintendent Gary Yee.

charter schools and the harm these students and schools would suffer if instruction were interrupted and the schools were no longer able to operate. The court concluded that the hardships weighed in favor of granting a preliminary injunction and that AIMS had demonstrated a likelihood of prevailing at trial because the record did not contain substantial evidence that the District complied with the requirements under Education Code section 47607, subdivision (c)(2).[2] The court issued a preliminary injunction to maintain the status quo pending resolution of the appeal of the revocation decision.

Defendants appeal from the preliminary injunction order, arguing that the trial court abused its discretion in finding that AIMS is likely to prevail at trial. Defendants maintain that section 47607, subdivision (c)(2) requires the District to consider academic achievement but the trial court incorrectly interpreted this provision as requiring the District to make findings supported by substantial evidence that it complied with this provision. Defendants also challenge the trial court's interpretation of section 47607, subdivision (i), and claim that issuing an injunction, which requires continued funding to the charter schools during the pendency of AIMS's appeal, contravenes the mandate of section 47607, subdivision (i). Additionally, defendants maintain that the court failed to give sufficient deference to the District's decision when it ruled AIMS was likely to prevail on the merits, that the court usurped the jurisdiction of the State Board of Education (the SBE), and that the court should not have issued any ruling in the absence of the California Department of Education (the CDE), which they maintain was an indispensable party.

We are not persuaded by defendants' arguments and affirm the order granting the preliminary injunction.

## BACKGROUND

### *California's Charter School Law*

The Legislature is charged with providing a public education system for the citizens of the State of California. (Cal. Const., art. IX, § 5; *Today's Fresh Start, Inc. v.*

---

[2] All further unspecified code sections refer to the Education Code.

*Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 205 (*Today's Fresh Start*).) The Legislature's power over the public school system is plenary, subject only to constitutional restraints. (*Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1134 (*Wilson*).) The Legislature has established public school districts and authorized charter schools with the Charter Schools Act of 1992 (§ 47600 et seq., added by Stats. 1992, ch. 781, § 1, pp. 3756-3761). (See *Today's Fresh Start,* at p. 205.)

Charter schools are "public schools funded with public money but run by private individuals or entities rather than traditional public school districts." (*Today's Fresh Start, supra,* 57 Cal.4th at p. 205.) "The Legislature intended its authorization of charter schools to improve public education by promoting innovation, choice, accountability, and competition. [Citation.]" (*Id.* at pp. 205-206.) The legislation "authorized various public bodies to approve charters, supervise charter school operations, and revoke charters in the event particular standards and conditions were not met." (*Id.* at p. 205) " ' "Where the Legislature delegates the local functioning of the school system to local boards, districts or municipalities, it does so, always, with its constitutional power and responsibility for ultimate control for the common welfare in reserve." ' " (*Wilson, supra,* 76 Cal.App.4th at p. 1135.)

"[C]harter schools are *strictly* creatures of statute." (*Wilson, supra,* 75 Cal.App.4th at p. 1135.) "Charter schools are initiated by submitting a petition to the chartering authority, generally the governing board of a public school district but occasionally a county board or the [SBE]. [Citations.]" (*Today's Fresh Start, supra,* 57 Cal.4th at p. 206.) "Once approved, charter schools are operated independently, but are subject to public oversight. [Citations.]" (*Ibid.*) "Chartering authorities must monitor schools' fiscal condition and academic performance and are authorized to investigate whenever grounds for concern arise. [Citations.]" (*Ibid.*) Section 47607 specifies the grounds and manner in which a school's charter may be revoked. (§ 47607, subds. (c)-(k).)

The Legislature has amended the Charter Schools Act of 1992 various times. In 2006, the Legislature amended section 47607 (added by Stats. 2006, ch. 757, Assem. Bill

3

No. 2030) to require, among other things, that the decision to revoke be supported by substantial evidence. (See § 47607, subds. (c), (e), (f), & (g).) In 2012, the Legislature added subdivision (c)(2) when amending section 47607. (Sen. Bill No. 1290.) This provision provides that "increases in pupil academic achievement for all groups of pupils served by the charter school" shall be considered "as the most important factor in determining whether to revoke a charter." (§ 47607, subd. (c)(2).) According to the legislative history of Senate Bill No. 1290, " 'all groups of pupils served by the charter school' " is defined as "a numerically significant pupil subgroup served by the charter school."

The comments section of the analysis of Senate Bill No. 1290 provides: "According to the author, in October 2010, the [CDE] was informed by the federal Department of Education (DOE) that California's public charter school petition authorization, renewal and revocation laws were inadequate and therefore out of compliance with the Public Charter School Grant (PCSG) Program. The PCSG Program provides grants of up to $575,000 to plan and implement new charter schools. Its funding is integral to the successful development of successful and high quality public charter schools. Specifically, the DOE informed the CDE that the state is . . . completely out of compliance with Assurance 3B in the PCSG application because increases in pupil academic achievement in all groups of pupils . . . is not the 'primary consideration' in the approval, renewal, and revocation of California charter schools."

The comments section of the analysis of Senate Bill No. 1290 elaborated: "Assurance 3B requires that authorized public chartering agencies use increases in student academic achievement for all groups of students . . . as the most important factor when determining to renew or revoke a school's charter." The DOE determined that California was "out of compliance" with Assurance 3B "because there [was] no explicit statutory or regulatory requirement that (1) each and every charter school demonstrate improved student academic achievement or (2) increases in academic achievement for all pupils be the primary factor in a renewal decision[] . . . . In addition, the DOE noted that California's revocation regulations apply only to charter schools in the lowest deciles and

4

not all charter schools." "On September 1, 2011, the CDE sent a letter to the DOE committing to pursue legislation during the 2012 legislative year to resolve these areas of noncompliance. By passing this measure, the state can ensure that California will not put at risk or jeopardize much needed funding to support the establishment of high quality, high performing charter school operations for California students and their families."

The comments to Senate Bill No. 1290 observed that the changes resulting from this bill were "not sweeping," but they also were "not unsubstantial." The comments provided: "This bill specifies that a charter authorizer must consider increases in pupil academic achievement for all groups of pupils served by the school, as measured by the [Academic Performance Index (API)], 'as the most important factor' for renewal and revocation. This does not mean the charter school is automatically not renewed or revoked, but it does mean that the charter authority must consider this information as the most important factor in making its decision. In other words, the charter authority must give extra weight to this factor when it considers all the factors for renewal or revocation."

### The Revocation of the Charters Granted to AIMS

The District revoked the three charters for the schools in Oakland operated by AIMS in 2013, after the enactment of section 47607, subdivision (c)(2). The three charter schools operated by AIMS are the American Indian Public High School (AIPHS), which opened in 2006; the American Indian Public Charter School (AIPCS), which opened in 1996, and includes grades five through eight;[3] and the American Indian Public Charter School II (AIPCS II), which opened in 2007, and serves kindergarten through eighth grade. In 2013, approximately 285 students attended AIPHS, 250 students attended AIPCS, and 649 students attended AIPCS II.

---

[3] Kimberly Palmore, the Assistant Site Administrator for AIPHS and AIPCS declared that AIPCS serves approximately 250 inner-city students in fifth through eighth grade, while the trial court's order granting in part the preliminary injunctions states that AIPCS includes grades six through eight.

Ben Chavis, frequently referred to as "the founder," was hired as the director of AIPCS in 2000, and became the director of AIPHS and AIPCS II when they opened. Chavis resigned as the director sometime prior to 2011. The charter schools are governed by a board of directors (AIMS's Board).

The API score for the students at AIPCS in the school year of 2001-2002 increased to 596 from a score of 436 a year earlier.[4] No other school in California that year improved as much as AIPCS. The National Charter School Clearinghouse wrote on its website about the 2002 results, " 'These accomplishments took place among a student population where 96 [percent] of students qualified for free/reduced lunch, 5-20 [percent] were homeless, and all were minorities.' "

In the school year of 2009-2010, AIPCS had a score of 988 on the API, which was the highest in the state. For that same school year, AIPCH II had an API of 974, the sixth highest score in the state, and the AIPHS had an API of 976, the fourth highest score in the state. According to reports by the CDE, all three schools in the 2011-2012 school year scored between 928 and 981 on the API. AIPCS and AIPHS have had an API over 950 for the past five years, and AIPHS serves an 86 percent low-income, and 100 percent minority population. During the 2010-2011 school year, the CDE recognized AIPCS II with the Title I California Distinguished School Award for closing the achievement gap between rich and poor students. In 2012, AIPCS II students and teachers earned the highest API for any public middle school in Alameda County.

On June 12, 2012, the Fiscal Crisis and Management Assistance Team, at the request of the Alameda County Superintendent of Schools (the Superintendent), conducted an extraordinary audit of AIMS. The audit uncovered evidence of conflict of interest violations, fiscal mismanagement, and improper use of public funds at the three charter schools.

The District issued a Notice of Violation (NOV) dated September 20, 2012, to AIMS. The NOV set forth numerous violations under section 47607, subdivision (d),

---

[4] The API is a numeric score ranging from 200 to 1,000.

6

including an allegation that Chavis and his spouse, Marsha Amador, received approximately $3.9 million in financial benefit through contract and other financial arrangements between the AIMS and AIMS's Board. The NOV further provided: "There was no indication that [AIMS's] Board took any steps to account for the founder's financial interests in the agreements it approved, or was even aware that such agreements were illegal. [AIMS's] Board also failed to maintain fiscal control over the AIMS charter schools, or to demonstrate capacity to grasp even the fundamentals of governance."

AIMS responded to the NOV on November 26, 2012. After reviewing AIMS's response, the District's Board issued a Notice of Intent to Revoke (NIR) on January 24, 2013. The NIR stated that the primary grounds for revoking were the following: "AIMS did not acknowledge that its founder, . . . Chavis, committed conflict of interest violations, nor did AIMS take steps to address those conflicts of interests." "AIMS failed to institute acceptable institutional reforms to safeguard against future violations." "AIMS failed to institute acceptable changes in its financial and operational procedures to ensure that future fiscal mismanagement does not occur." "AIMS failed to engage sufficient institutional expertise, such as a charter management organization, to implement the necessary institutional and organizational overhaul of its operations." "AIMS failed to address in an acceptable manner any means or process for defining the role of the founder or achieving the necessary separation of him from the organization." The Superintendent recommended the approval of the issuance of the NIR.

On February 27, 2013, the District's Board held a public hearing on whether to revoke the charters of the three schools operated by AIMS. AIMS provided a supplemental response to the NOV.

Superintendent Anthony Smith, Ph.D., filed a report dated March 16, 2013 (the Report). This Report stated that a charter may be revoked under section 47607, subdivision (c). The Report delineated the alleged violations and the evidence in support of them. With regard to the District's consideration of student achievement, the Report specified: "Effective January 1, 2013, [s]ection 47607[, subdivision] (c)(2) . . . was amended to provide that the authority that granted the charter shall consider increases in

7

pupil academic achievement for all groups served by the charter school as the most important factor in determining whether to revoke a charter. [¶] Although the performance of AIMS students is an important factor in its decision, the [s]taff believes that AIMS's failure to remedy the conflict of interest violations, its failure to institute sufficient changes to the management of the AIMS organization, its failure to institute structural or permanent changes to the governing board, its failure to take action to recover the public funds intended for AIMS students paid to Dr. Chavis, and its lack of candor in response to the District's revocation proceedings, outweigh all other factors in considering whether to revoke the AIMS charters, including the schools' academic performance."

The Report also provided the 2012 API scores of the three charter schools. It observed that the schools had "a track record of high academic performance." The Report pointed out that "[t]he District must balance the academic performance of AIMS schools against [the] weighty legal obligation" to oversee the use of public funds. Superintendent Smith concluded that revocation was appropriate to respond to the alleged acts of fiscal misconduct.

The District's Board held a public meeting regarding the NIR on March 20, 2013. Following the meeting, it issued a resolution revoking the charter of AIMS's three schools (the Resolution). The Resolution delineated the requirements of section 47607, subdivision (c)(2), and noted the 2012 API scores of the three charter schools. The Resolution stated that substantial evidence supported the allegations that AIMS violated conflict of interest laws when it entered into contracts with its founder and his spouse, which resulted in profit for the founder and his spouse. The Resolution provided that substantial evidence supported various other allegations, including the charges that AIMS violated section 47605, subdivision (d)(1), that AIMS committed fiscal mismanagement, and that AIMS failed to acknowledge or address many of the violations.

The Resolution concluded: "The District has considered 'increases in pupil academic achievement for all groups of pupils served by the charter school' under . . . [s]ection 47607[, subdivision] (c)(2). Although the performance of AIMS students is an

8

important factor in its decision, the [s]taff believes that [AIMS's] failure to remedy the conflict of interest violations, its failure to institute sufficient changes to the management of the AIMS organization, its failure to institute structural or permanent changes to the governing board, its failure to take action to recover the public funds intended for AIMS students paid to Dr. Chavis, and its lack of complete candor in response to the District's revocation proceedings, outweigh all other factors in considering whether to revoke the AIMS charters, including the schools' academic performance." The District's Board ordered the revocation of AIMS's three charters, with an effective date of June 30, 2013.

On March 28, 2013, counsel for the District sent the Director of the AIMS's three charter schools a letter. In this letter, AIMS was advised, among other things, that the three schools "will cease to be eligible for funding apportionments as of July 1, 2013." The letter added, "The District has conducted outreach sessions with AIMS parents to facilitate the transition of their children to their new programs, including inclusion of the impacted families in the District's options program."

AIMS appealed the revocation decision to the Alameda County Board of Education (the County Board), and the County Board held a public hearing on the revocation. In June 2013, the County Board voted to uphold the revocation. Subsequently, AIMS filed an appeal to the SBE.

*The Preliminary Injunction*

On May 23, 2013, prior to its appeal of the District's revocation decision to the County Board, AIMS filed in the superior court a petition for writ of mandate and complaint for injunctive relief pursuant to Code of Civil Procedure sections 1085, 1094.5, and 1102 against defendants. The petition requested an order to compel the setting aside of the revocation of the three charters granted to AIMS, and an order prohibiting any action pursuant to the revocation. AIMS alleged that the District's Board did not comply with section 47607, subdivision (c)(2), and violated AIMS's right to due process.

AIMS filed on June 3, 2013, an ex parte application for a temporary restraining order to prevent the District from revoking the three charters. On June 6, 2013, the trial court issued its order granting in part the request for a temporary restraining order; the

9

court set a hearing on the request for a preliminary injunction. The court stated that it was not addressing whether AIMS demonstrated a likelihood of prevailing on its claims. Rather, the court's sole finding was that AIMS had demonstrated an imminent danger of irreparable harm to itself and its students if the temporary restraining order were not granted.

AIMS filed a motion for a preliminary injunction on June 14, 2013. It alleged in the petition that the status quo must be maintained or its three charter schools would be forced to close and the students, staff, and schools would suffer irreparable harm. In defendants' opposition, they argued, among other things, that the District complied with the statute and that the CDE is an indispensable party.

After holding a hearing, the superior court issued its order on July 19, 2013, granting in part AIMS's motion for a preliminary injunction. The court stated that when, as in this case, the underlying claim is a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5, the court must consider "(1) the likelihood that the plaintiff will prevail on the merits at trial and (2) the interim harm the plaintiff may suffer if the injunction is denied as compared to the harm that the defendant may suffer if the injunction is granted." It noted that its "analysis of the merits of the case is expressly preliminary. 'The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy.' (*Woods v. Superior Court* (1980) 102 Cal.App.3d 608, 615-616.)"

When evaluating the harm that AIMS might suffer, the superior court explained in its order the following: "The core purpose of this action is to stay the District's decision to revoke the charter of the AIMS schools under [section] 47607 and thereby permit the AIMS schools to continue to operate and provide educational services to their students while AIMS pursues its administrative appeals and judicial remedies. AIMS has demonstrated that it will suffer significant interim harm if the preliminary injunction is denied because its faculty and student body will dissipate to other institutions. In addition, the students served by the AIMS schools will be deprived of the opportunity to obtain an education at schools that have enabled those students to obtain high API and

10

SAT test scores." The District, the court noted, asserted that it would "suffer harm from the misuse of public funds if it [were] required to fund the AIMS schools for [the] duration of administrative process." The court pointed out that the District identified financial irregularities in the past management of the AIMS schools but failed to specify any "threat of future financial irregularity." The court concluded, "On balance, the court finds that AIMS has demonstrated that the interim harm it and AIMS students would suffer if the injunction is denied will substantially exceed the harm that the [District] would suffer if the injunction is granted."

With regard to the second factor, prevailing on the merits at trial, the superior court cited section 47607, subdivision (c)(2), and found that the District "made legal errors in its analysis because it (1) failed to consider increases in pupil academic achievement '*as the most important factor*' and (2) failed to consider increases in pupil academic achievement '*for all groups of pupils*.' " The court emphasized that it was making "no preliminary finding whether there is substantial evidence that the [District] considered academic achievement as 'the most important factor.' " The court pointed out that the NIR, the Report, and the Resolution, recited portions of section 47607, subdivision (c), and declared, " 'performance of AIMS students is *an important factor* in the decision . . . ." The Report and Resolution provided that the District considered and weighed the academic performance scores of the AIMS schools and the court concluded that substantial evidence showed that the District considered academic achievement as an important factor. The court cautioned, however, that "the content and quality of the analysis does not clearly reflect that the [District] considered academic achievement as 'the most important factor.' " The court added that it was not reaching the question whether the record contained substantial evidence that the District considered academic achievement as the most important factor.

The trial court stated that it was making a preliminary finding that the record did not contain substantial evidence to show that the District considered increases in pupil academic achievement for all groups of pupils. The court observed that the District cited the API scores, but the record contained no information suggesting that the District

11

considered test scores of any " 'numerically significant pupil subgroup' " or that the District determined that there were no " 'numerically significant pupil subgroups' " as defined by section 52052.

The trial court added: "Although not raised by the parties, the court notes that . . . section 47607[, subdivision] (c) requires an authority to consider 'increases' in pupil academic achievement. The reference to 'increases' suggests that an authority must consider improvement over time rather than a one-year snapshot of academic performance. There is no information in the record suggesting that the [District] considered 'increases' in pupil academic achievement." The court thus concluded that there was a reasonable probability that AIMS would prevail on the merits of its claim because there was "a reasonable probability that there is no substantial evidence that the [District] considered 'increases' in pupil academic achievement for 'all groups of pupils.' "

The superior court elaborated: "Balancing the factors, the court finds that a preliminary injunction is appropriate. The court's goal in this preliminary injunction order is to ensure the AIMS schools can remain open while they pursue their administra[tive] and judicial remedies. The court does not intend to interfere with any appeal to the [SBE], with the [District's] ability to monitor and supervise the AIMS schools in the manner that it would monitor and supervise other schools that have charters, with the [District's] ability to monitor the use of public funds by or at the AIMS schools to the fullest extent permitted to schools that have charters, or with [the District's] conduct of any audit that might be a consequence of the [District's] revocation decision."

The trial court also addressed the absence of the CDE. It refused to defer the hearing on the motion for a preliminary injunction to permit joinder of the CDE, explaining that its order was not addressing the CDE's obligations.

Following the superior court's ruling on the preliminary injunction, AIMS appealed the revocation of its three charters to the SBE.

12

*Writ and Appeal in this Court*

On August 30, 2013, defendants filed a petition for writ of mandate in this court. We summarily denied this petition on November 22, 2013.

On September 9, 2013, defendants filed a notice of appeal from the order granting in part the preliminary injunction. Subsequently, on November 13, 2013, defendant filed a motion requesting this court to take judicial notice of a letter from counsel for the CDE regarding AIMS's appeal to the SBE (the CDE letter), AIMS's brief in support of its appeal, and the minutes of the County Board meeting on June 25, 2013. AIMS filed opposition to our taking judicial notice of the CDE letter. On December 12, 2013, we issued an order stating that this court would rule on the request for judicial notice when deciding the appeal.

On January 14, 2014, AIMS filed a motion requesting that we take judicial notice of the petition for writ of mandate filed by defendants in this court. We granted this unopposed request on February 11, 2014.

The California School Boards Association's Education Legal Alliance (Education Legal Alliance) applied to file an amicus curiae brief in support of defendants. We granted this request on March 11, 2014; the amicus brief was filed on this same date. AIMS filed a response to the amicus curiae brief.

## DISCUSSION

### I. *Standard of Review*

Generally, the standard of review for grant or denial of a preliminary injunction is whether the trial court committed an abuse of discretion. (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1145.) In exercising that discretion, the court must consider "two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.) We review each determination for an abuse of discretion. (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890.) However, where "the determination on the likelihood of a party's success rests on an issue of pure law not presenting factual issues

13

to be resolved at trial," "we review the determination de novo." (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1403.)

In the present case, all of defendants' arguments challenge the trial court's finding that AIMS did not prove a probability of success on the merits. Defendants, the party with standing, did not challenge the trial court's finding that the balance of harms weighed in favor of AIMS.[5] Education Legal Alliance, however, claims error on this basis in its amicus brief. An appellate court generally does not consider new arguments raised on appeal by amicus curiae. (*Costa v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1177, 1187-1188.) The Supreme Court has recognized two exceptions: The amicus curiae may raise an issue that will support affirmance and the amicus curiae may assert jurisdictional questions that cannot be waived even if not raised by the parties. (*Id.* at p. 1188.) Neither of these exceptions applies here.[6]

## II. *AIMS's Motion to Strike*

On March 13, 2014, AIMS filed a letter objecting to portions of defendants' reply brief, and defendants filed opposition. We issued an order on April 4, 2014, stating that we were treating the letter as a motion to strike portions of the reply brief and that we would decide this request with the appeal.

---

[5] Indeed, defendants criticize AIMS for attempting to divert this court's attention to the alleged irreparable harm it would suffer absent the injunction and declare that irreparable harm is "an issue that is not raised on appeal[.]"

[6] Education Legal Association contends that the Education Code mandates the discontinuation of any funding during the pendency of an appeal when the revocation is based on a legal violation or fiscal mismanagement and therefore any hardship resulting from the disruption of instruction should be addressed to the Legislature, not the court. Education Legal Association concludes that the trial court did not correctly weigh the relative hardships because all of the hardships suffered by AIMS were required by the statute.

Defendants make essentially the same argument that the statute bars funding during the pendency of an appeal when the decision to revoke is based on fiscal mismanagement, but characterize this as a challenge to the trial court's finding that AIMS showed a probability of success on the merits. We address all arguments related to the Education Code and continued funding during the pendency of an appeal in part V.

14

In its motion to strike, AIMS objects to one footnote and to four pages in defendants' 31-page reply brief. AIMS protests defendants' citation to statutes (e.g., §§ 47607.3, 52060) that defendants did not mention in their opening brief in this court. AIMS stresses that it did not have an opportunity to respond to argument related to these statutes. As an alternative to striking this material, AIMS requests permission to file a supplemental brief to respond "to these new issues and points."

We will not ordinarily consider issues raised for the first time in a reply brief. (*Kovacevic v. Avalon at Eagles' Crossing Homeowners Assn.* (2010) 189 Cal.App.4th 677, 680, fn. 2.) An issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief. Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

In their reply brief, defendants cite statutes not discussed in their opening brief. These statutes are cited in support of their argument that the trial court incorrectly interpreted section 47607, subdivision (c)(2). Defendants challenged the trial court's construction of section 47607, subdivision (c)(2) in their opening brief, and defendants did not raise a new issue or argument in their reply brief. Defendants may cite new authorities in support of arguments properly raised in the opening brief.

Accordingly, we deny AIMS's request to strike portions of the reply brief or to file a supplemental brief.

### III. *Defendants' Failure to Comply with Section 47607, Subdivision (c)(2)*

### A. *Construction of the Statute*

Defendants maintain that when the trial court found that AIMS was likely to prevail on its claim that the District did not comply with section 47607, subdivision (c)(2), the court incorrectly interpreted this statute.[7]

Section 47607, subdivision (c) sets forth the grounds for revoking a charter. Subdivision (c)(1) provides: "A charter may be revoked by the authority that granted the charter under this chapter if the authority finds, through a showing of substantial evidence, that the charter school did any of the following: [¶] (A) Committed a material violation of any of the conditions, standards, or procedures set forth in the charter. [¶] (B) Failed to meet or pursue any of the pupil outcomes identified in the charter. [¶] (C) Failed to meet generally accepted accounting principles, or engaged in fiscal mismanagement. [¶] (D) Violated any provision of law." Subdivision (c)(2) reads: "The authority that granted the charter shall consider increases in pupil academic achievement for all groups of pupils served by the charter school as the most important factor in determining whether to revoke a charter."

Defendants argue that subdivision (c)(2) of section 47607 simply required the District to "consider," take into account, or keep in mind, pupil academic achievement for all groups of students as the most important factor as a procedural step in the revocation process, and that the trial court was limited to reviewing whether the District complied with this duty. Defendants maintain that the record showed the District did consider the academic achievement of the AIMS students and the court should have found that it complied with this procedural requirement. Defendants argue that the substantial evidence requirement applies to section 47607, subdivision (c)(1), and no language in subdivision (c)(2) includes a substantial evidence requirement. They assert that the

---

[7] The amicus brief in support of defendants filed by Education Legal Alliance advances many of the same arguments raised by defendants. We will specify that a point or argument is urged by Education Legal Alliance only in those situations where the point or argument is in addition to or different from the argument in defendants' brief.

Legislature expressly states that findings are required in other statutes and the absence of any such requirement in section 47607, subdivision (c)(2), makes it clear that the Legislature did not intend such a requirement in this provision.

It is well settled that when interpreting a statute we "determine and give effect to the intent of the enacting legislative body." (*People v. Braxton* (2004) 34 Cal.4th 798, 810.) To do this, " '[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.) "[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 505.) If the statute is susceptible to more than one interpretation, we "may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.]" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.) Moreover, " ' "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.]" ' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.)

The Legislature enacted section 47607, subdivision (c)(2) in 2012. (Sen. Bill No. 1290.) This subdivision required the District to "consider increases in pupil academic achievement for all groups of pupils served by the charter school as the most important factor in determining whether to revoke a charter." (§ 47607, subd. (c)(2).) The statute does not indicate that the District's obligation is satisfied by announcing it has considered increases in pupil academic achievement. Rather, this statute pronounces that this consideration must be made as "the most important factor" when deciding whether to revoke a charter. (*Ibid.*)

17

Defendants' construction of subdivision (c)(2) is incompatible with the language of other subdivisions of section 47607. When revoking a charter, section 47607 requires "a written decision with factual findings supporting any revocation decision." (*Today's Fresh Start, supra,* 57 Cal.4th at p. 207.) Subdivision (e) of section 47607 specifies that "[t]he chartering authority shall not revoke a charter, unless it makes written factual findings supported by substantial evidence, specific to the charter school, that support its findings." Furthermore, if the school district is the chartering authority and revokes a charter, which is appealed, the county board of education reviews the decision for substantial evidence. (§ 47607, subd. (f)(1)-(3).) If appealed to the SBE, the SBE "may reverse the revocation decision" if it "determines that the findings made by the chartering authority under subdivision (e) are not supported by substantial evidence." (§ 47607, subd. (f)(4); see also § 47607, subd. (g).)[8]

Subdivisions (e) and (f)(2) of section 47607 make it clear that the decision to revoke the charter must be supported by substantial evidence. Since subdivision (c)(2) requires a consideration of increases in pupil academic achievement for all groups of pupils served by the charter school as the most important factor when determining whether to revoke the charter, the District's consideration of this factor must be supported by substantial evidence under section 47607, subdivision (e). (See also *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 (*Topanga Assn.*) [Code of Civil Procedure section 1094.5, the state's administrative mandamus provision, "contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision" and implicit to this statute "is a requirement that the agency which renders the challenged decision must set

---

**8** The reviewing bodies may choose to allow the prescribed time for review to expire rather than review a decision for substantial evidence. (See § 47607, subd. (f)(3); Cal. Code Regs., tit. 5, § 11968.5.5, subd. (f) [if the SBE does not take action within the prescribed time, "the appellant is deemed to have exhausted its administrative remedies"].)

forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order"].)

Defendants stress that substantial evidence is included in the language in section 47607, subdivision (c)(1), and argue that the absence of such language in subdivision (c)(2) is significant. Defendants also cite sections 47607.3, subdivision (b),[9] and 52060[10]

---

[9] Section 47607.3, subdivision (b), provides in relevant part: "A chartering authority shall consider for revocation any charter school to which the California Collaborative for Educational Excellence has provided advice and assistance pursuant to subdivision (a) and about which it has made either of the following findings, which shall be submitted to the chartering authority: [¶] (1) That the charter school has failed, or is unable, to implement the recommendations of the California Collaborative for Educational Excellence. [¶] (2) That the inadequate performance of the charter school, based upon an evaluation rubric adopted pursuant to Section 52064.5, is either so persistent or so acute as to require revocation of the charter."

[10] Section 52060, subdivision (c) states: "A local control and accountability plan adopted by a governing board of a school district shall include, for the school district and each school within the school district, both of the following: [¶] (1) A description of the annual goals, for all pupils and each subgroup of pupils identified pursuant to Section 52052, to be achieved for each of the state priorities identified in subdivision (d) and for any additional local priorities identified by the governing board of the school district. For purposes of this article, a subgroup of pupils identified pursuant to Section 52052 shall be a numerically significant pupil subgroup as specified in paragraphs (2) and (3) of subdivision (a) of Section 52052. [¶] (2) A description of the specific actions the school district will take during each year of the local control and accountability plan to achieve the goals identified in paragraph (1), including the enumeration of any specific actions necessary for that year to correct any deficiencies in regard to the state priorities listed in paragraph (1) of subdivision (d). The specific actions shall not supersede the provisions of existing local collective bargaining agreements within the jurisdiction of the school district."

Section 52060, subdivision (d)(4) reads: "(d) All of the following are state priorities: [¶] . . . [¶] "(4) Pupil achievement, as measured by all of the following, as applicable: [¶] (A) Statewide assessments administered pursuant to Article 4 (commencing with Section 60640) of Chapter 5 of Part 33 or any subsequent assessment, as certified by the state board. [¶] (B) The Academic Performance Index, as described in Section 52052. [¶] (C) The percentage of pupils who have successfully completed courses that satisfy the requirements for entrance to the University of California and the California State University, or career technical education sequences or programs of study that align with state board-approved career technical educational standards and frameworks . . . . [¶] (D) The percentage of English learner pupils who make progress

19

because these statutes specify exactly what the school district must do. Defendants conclude that the Legislature knows how to require specific findings and since no findings were mandated in section 47607, subdivision (c)(2), the Legislature did not intend such a requirement.

Defendants, however, ignore that prior to the enactment of Assembly Bill No. 2030 in 2006, subdivision (c) did not require that a revocation be supported with substantial evidence. (Former § 47607, subd. (c).) Subdivisions (e), (f), and (g) were not included in this earlier version of the statute. In 2006, Assembly Bill No. 2030, amended the statute to add the substantial evidence requirements in subdivision (c). The statute was also amended to, among other things, add subdivisions (e), (f)(2), and (g)(2), which included the substantial evidence requirement. In 2012, when Senate Bill No. 1290 was enacted and added subdivision (c)(2) to section 47607, there was no need to include the substantial evidence language because subdivision (e) of section 47607, added earlier in 2006, made it clear that "[t]he chartering authority shall not revoke a charter, unless it makes written factual findings supported by substantial evidence, specific to the charter school, that support its findings."

Similarly, defendants' citations to sections 47607.3 and 52060 are not compelling. These statutes specify what is required because no other statute or provision sets forth what is needed. In contrast, section 47607 makes it clear that a revocation decision must be supported by factual findings.

Education Legal Alliance argues that section 47607, subdivision (c)(1) provides that a charter may be revoked if any one of the enumerated violations is supported by substantial evidence. It claims that interpreting subdivision (c)(2) in a manner that requires pupil academic achievement to be the most important factor nullifies subdivision

toward English proficiency as measured by the California English Language Development Test or any subsequent assessment of English proficiency, as certified by the state board. [¶] (E) The English learner reclassification rate. [¶] (F) The percentage of pupils who have passed an advanced placement examination with a score of 3 or higher. [¶] (G) The percentage of pupils who participate in, and demonstrate college preparedness pursuant to, the Early Assessment Program . . . ."

20

(c)(1) because it would divest the chartering authority of the discretion to revoke a charter on any one of the bases enumerated in that subdivision.  It notes that "[i]mplied repeals may be found only where ' "there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are '. . . so inconsistent that the two cannot have concurrent operation.' " ' " (*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1005, fn. omitted.)

Education Legal Alliance insists that the trial court's interpretation of subdivision (c)(2) results in an improper repeal of subdivision (c)(1) of section 47607 and that these two subdivisions can be harmonized.  Education Legal Alliance points out that a charter may be revoked under section 47607, subdivision (c)(1)(b) for failure "to meet or pursue any of the pupil outcomes identified in the charter."  " 'Pupil outcomes,' " must be set forth in the charter petition and they mean "the extent to which all pupils of the school demonstrate that they have attained the skills, knowledge, and attitudes specified as goals in the school's educational program.  Pupil outcomes shall include outcomes that address increases in pupil academic achievement both schoolwide and for all groups of pupils served by the charter school . . . ."  (§ 47605, subd. (b)(5)(B).)

Education Legal Alliance emphasizes that section 47607, subdivision (c)(2) uses the same words and phrases as section 47605, subdivision (b)(5)(B).  It proposes that subdivision (c)(2) does not require a new showing or any additional requirement.  Rather, according to Education Legal Alliance, when revocation occurs under section 47607, subdivision (c)(1)(B), subdivision (c)(2) of section 47607 clarifies that student achievement of all groups is the most important factor.

The construction urged by Education Legal Alliance does not harmonize the statutes; it rewrites them.  Subdivision (c)(2) of section 47607, which states that "[t]he authority that granted the charter shall consider increases in pupil academic achievement for all groups of pupils served by the charter school as the most important factor in determining whether to revoke a charter[,]" was not written to be applied simply to section 47607, subdivision (c)(1)(B).  Rather, the express language of subdivision (c)(2) is that it is the most important factor whenever a charter may be revoked.  Indeed, the

interpretation urged by Education Legal Alliance would render subdivision (c)(2) redundant and meaningless.

Furthermore, the trial court's construction of the statute did not nullify section 47607, subdivision (c)(1). The chartering authority may revoke a charter based on any one of the four criteria set forth in subdivision (c)(1), but when making this decision it must consider increases in pupil academic achievement as the most important factor.

Education Legal Alliance claims that the legislative history supports its interpretation. It maintains that section 47607, subdivision (c)(2) was added to meet the higher charter school accountability standards required by the federal government. It claims that the purpose was to make sure that charter schools would not continue if one or more student groups was not succeeding.

We disagree that the legislative history supports Education Legal Alliance's construction of the statute. The fact that the purpose for enacting subdivision (c)(2) of section 47607 was to prevent charter schools from being able to continue if their students were not doing well academically, does not mean that the Legislature intended for academic excellence to be discounted in those situations where the charter was being revoked from a school where the students excelled academically.

As already discussed, subdivision (c)(2) of section 47607 became effective on January 1, 2013. (Sen. Bill No. 1202.) The comments section to the Senate hearing on Senate Bill No. 1202 emphasized "that a charter authorizer must consider increases in pupil academic achievement for all groups of pupils served by the school, as measured by the API, 'as the most important factor' for renewal and revocation. . . . In other words, the charter authority must give extra weight to this factor when it considers all the factors for renewal or revocation." These comments indicate that the District's obligation was to give this factor extra weight *whenever* it was deciding whether to revoke the charter and was not limited to those situations involving schools with low API scores.

Finally, policy considerations support the trial court's construction of the statute. As our Supreme Court explained in *Topanga Assn., supra,* 11 Cal.3d 506, requiring an administrative agency to set forth findings to support their decisions "stems primarily

22

from judge-made law [citations], and is 'remarkably uniform in both federal and state courts.' As stated by the United States Supreme Court, the 'accepted ideal . . . is that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." [Citations.] [¶] Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.]" (*Id.* at pp. 515-516.)

Defendants argue that imposing a substantial evidence requirement would prevent the District from ever revoking a charter if the school had high test scores because, according to defendants, "there would not be substantial evidence that the school considered the high test scores as the most important factor." This argument is not persuasive. The District must give extra weight and consideration to high test scores, but high test scores would not prevent revocation of a charter when the violations or egregious behavior outweigh this factor. As the comments to Senate Bill No. 1290 observed: "This bill specifies that a charter authorizer *must* consider increases in pupil academic achievement for all groups of pupils served by the school, as measured by the API, 'as the most important factor' for renewal and revocation. *This does not mean the charter school is automatically not renewed or revoked,* but it does mean that the charter authority must consider this information as the most important factor in making its decision. In other words, the charter authority *must give extra weight* to this factor when it considers all the factors for renewal or revocation." (Italics added.) Similarly, extra weight does not mean that a decision to revoke is automatically rejected when the students at the charter school have high test scores, but the increases in pupil academic achievement for all groups of pupils served by the school must be given extra weight when considering whether to revoke the charter.

Accordingly, we conclude that the trial court correctly interpreted section 47607, subdivision (c)(2), as requiring a decision to revoke to be supported by substantial

23

evidence that the District complied with this provision.  We thus now determine whether the trial court abused its discretion when it found the record did not show that the District complied with the mandates of this statute.

**B.  *Evidence in the Record Regarding Compliance with the Statute***

In their briefs in this court, defendants and AIMS seem to suggest that the trial court ruled that the evidence did not show that the District considered academic achievement as the most important factor.  The trial court, however, expressly stated that it was making "no preliminary finding whether there is substantial evidence that the [District] considered academic achievement as 'the most important factor.' "  The court noted that the evidence did not clearly demonstrate that the District considered academic achievement as the most important factor, but the court announced that it was not going to "reach whether there is substantial evidence that the [District] considered academic achievement as 'the most important factor.' "[11]

The trial court's grounds for granting the preliminary injunction were that the record was devoid of evidence indicating that the District considered *increases* in pupil academic achievement for pupil *subgroups*.  The court acknowledged that the District cited the 2012 API scores for all three charter schools, but the record contained "no information" "suggesting that the [District] considered test scores of any 'numerically significant pupil subgroup' or that the [District] determined that there were no 'numerically significant pupil subgroups' as defined by [section] 52052."[12]  The court

---

[11]  In support of their argument that they considered academic achievement as the most important factor, defendants cite the NIR, which stated that "[t]he District has considered the academic achievement of the AIMS program and considers AIMS'[s] academic record as the paramount factor to consider during the revocation process." They also cite evidence in the Superintendent's Report to the District's Board that the District considered the charter school's "track record of high academic performance."

[12]  Section 52052, subdivision (a) provides:  "(2)  A school or school district shall demonstrate comparable improvement in academic achievement as measured by the API by all numerically significant pupil subgroups at the school or school district, including: [¶] (A)  Ethnic subgroups. [¶] (B)  Socioeconomically disadvantaged pupils. [¶] (C) English learners. [¶] (D)  Pupils with disabilities. [¶] (E)  Foster youth. [¶] (3)(A)  For

24

also noted that subdivision (c) of section 47607 requires the District "to consider 'increases' in pupil academic achievement." Since the record contained no information suggesting that the District considered improvement over time rather than for just one year, the superior court's preliminary finding was that substantial evidence did not support the decision to revoke the three charters.

Defendants argue that the record contained evidence of increases in pupil academic achievement for all groups of pupils because the API score "inherently embedded data regarding pupil performance of all groups of pupils, as well as increases in pupil performance through the use of 'base' and 'growth' scores, and that the [c]harter [s]chool's historical performance, including increases in pupil performance for all subgroups of students, was part of the administrative record for the revocation process." Defendants then cite to six pages of argument at the hearing and to a request for judicial notice that includes a 38-page exhibit, dated April 4, 2012, which was the District's staff report regarding the renewal request of AIPCS II. They argue that the District had to evaluate the academic performance for all subgroups of students during the charter renewal process, the year prior to their decision to revoke the charter, and therefore it "was aware of all public information regarding the charter school's track record of academic performance, including increases in pupil performance for all student subgroups, and evaluated that data as part of its decision as to whether or not to renew or revoke the charter."

Defendants' citations to the record are woefully inadequate. An appellant has the burden on appeal of demonstrating that the trial court abused its discretion. (E.g., *Conservatorship of Ben C.* (2006) 137 Cal.App.4th 689, 697.) This burden includes supporting factual assertions by providing appropriate references to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C).) Rule 8.204(a)(1)(C) of the California Rules of

purposes of this section, a numerically significant pupil subgroup is one that consists of at least 30 pupils, each of whom has a valid test score. [¶] (B) Notwithstanding subparagraph (A), for a subgroup of pupils who are foster youth, a numerically significant pupil subgroup is one that consists of at least 15 pupils."

Court provides that each appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." This rule requires exact page references, and block-page references present difficulties because the appellate court is unable to evaluate which facts contained on those pages support the party's position. (*Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205.) Here, defendants' block references covered over 40 pages and they did not identify any particular page or evidence that showed they considered "increases in pupil academic achievement for all" subgroups "as the most important factor in determining whether to revoke a charter." (See § 47607, subd. (c)(2).) In fact, there is nothing in the record before us that indicates that the District considered improvement over time for all subgroups as the most important factor.

Furthermore, the report prepared to consider whether to renew a charter does not establish that the District properly evaluated this information when deciding to revoke the charter. The fact that it was attached to the NIR does not shed any light on how the District used the report when making its revocation determination.

We also agree with the trial court that the Report and the Resolution do not contain evidence showing that the District considered academic achievement for all groups as the most important factor. The Report and Resolution set forth the requirements under the statute and asserts that the violations outweigh all other factors, including the schools' academic performance. The Report and Resolution set forth the API scores for 2012, and the Report states these scores have been considered and acknowledges that "the AIMS charter schools have a track record of high academic performance." The Report also states that the District "has considered 'increase in pupil academic achievement for all groups of pupils served by the charter school' under" section 47607, subdivision (c)(2). These conclusory statements do not provide

26

substantial evidence demonstrating that the District considered the increases in pupil academic achievement for all pupil subgroups.[13]

We agree with the trial court that the Revocation and Report are devoid of any evidence indicating that the District considered test scores for pupil subgroups.[14]

## IV. *Deference to the District's Decision*

Defendants contend that the trial court failed to give sufficient deference to the District's decision when it ruled that AIMS was likely to prevail on the merits. AIMS brought its writ under Code of Civil Procedure sections 1085 and 1094.5, and both of these statutes, defendants argue, require the court to defer to the agency's decision.

Writ review, whether through administrative mandate (Code Civ. Proc., § 1094.5) or ordinary mandate (Code Civ. Proc., § 1085), gives substantial deference to the agency's findings. (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 774.) When reviewing an administrative agency's interpretation of a governing statute, we must " 'independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning.' [Citation.] The degree of 'respect' accorded the agency's interpretation is ' " 'not susceptible of precise formulation, but lies somewhere along a continuum,' " ' or, in other words, is '*situational*.' [Citation.] . . . [T]he degree of deference due an agency's interpretation depends upon two factors. First, the interpretation is entitled to significant deference if ' "the agency has expertise and technical knowledge, especially where the legal text to be

---

[13] The trial court made no finding regarding the District's determination that AIMS engaged in fiscal mismanagement and this issue is not considered in this appeal.

[14] We need not address the merits of AIMS's arguments about what the District had to show. For example, AIMS maintains that the District had to show substantial evidence supported a finding that increases in student achievement by subgroups were causally related or otherwise linked to the alleged administrative failings.

The issue before us is simply whether the trial court abused its discretion when it granted the preliminary injunction; we thus decide only that AIMS showed a probability that it would prevail because the Report and Revocation contained no evidence that the District considered increases for numerically significant pupil subgroups as the most important factor.

interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." ' [Citation.] Second, the interpretation is entitled to even greater deference if it is the result of high-level, formal agency decisionmaking. [Citation]" (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1541-1542 (*Southern California Cement Masons*).)

Here, subdivision (c)(2) of section 47607 does not involve technical, obscure, or complex language. Additionally, the interpretation urged by the District is not the result of high-level, formal agency decisionmaking. Thus, the District's interpretation of the statute is not entitled to significant deference.

We are required to exercise independent judgment regarding an agency's statutory interpretation, giving due deference to the agency's views, but we evaluate the agency's application of its governing statute to particular circumstances for an abuse of discretion. (*Southern California Cement Masons, supra,* 213 Cal.App.4th at p. 1549.) Courts "may not reweigh the evidence or substitute their judgment for that of the agency. They uphold an agency action unless it is arbitrary, capricious, lacking in evidentiary support, or was made without due regard for the petitioner's rights." (*Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185, 195.)

In the present case, the trial court did defer to the factual findings of the District. The court did not reweigh evidence, refuse to consider evidence supporting revocation, or make any credibility determination. The court considered all of the evidence and made a preliminary finding that there was no evidence suggesting that the District considered test scores of any subgroups or that it considered the increases in pupil academic achievement as required by the statute. Defendants have not provided this court with any citation to the record to show that it made findings showing that it weighed heavily the foregoing when deciding to revoke the charters. The trial court did not usurp the role of the District.

Defendants cite to the trial court's statements at the hearing on the preliminary injunction when arguing that the trial court impermissibly reweighed the evidence and

substituted its judgment for the District's judgment. They maintain that the court's comments showed that the court reweighed the evidence.[15] We disagree. The court's comments simply indicated that it understood that the District had to weigh the various factors and that school achievement was the most important factor. The court also correctly observed that it had to balance the hardships suffered by AIMS if the injunction were not granted by the hardships suffered by the District if the injunction were granted. Here, as already stressed, the court did not reweigh the factors; it properly found that the District did not make factual findings that showed it complied with section 47607, subdivision (c)(2).

Defendants also argue that the record contains evidence that it considered academic achievement as the most important factor and that the court ignored this evidence. As already discussed, the court did not ignore this evidence. In fact, the trial court did not grant the preliminary injunction on the ground that the District failed to consider academic achievement as the most important factor. Rather, the court found that the District failed to consider increases in academic achievement and it failed to look at increases in academic achievement for all groups of pupils at AIMS's schools as the most important factor when deciding to revoke the charter.

---

**15** The trial court stated: "If you have a weighing process, and you say, on the one side is an important factor, and we're going to weigh it against all of these other factors, the scale may very well tip in the favor of the other factors. On the other hand, if you say it's the most important factor, which indicates both a qualitative and a quantitative difference, then maybe the scale tips in the other direction." Later, the court commented: "I agree with you that different people could reach different conclusions on this record. I do agree with that. But having looked at that, and then having to do the balancing that I have to do as a judicial officer, before I decide whether or not the school will live for another day while it exercises its appellate rights or not, and in that balancing process, look at the school, and look at its performance, which is, according to our Legislature, the most important standard . . . . And I'm looking at this litany of what I believe the record shows as very, very extraordinary performance. And then I have to weigh that against if I say they don't get another day, or they don't have the opportunity to exhaust their final appeal. [¶] I'm not seeing how the balance of hardships favors your client as against the school, AIM school, and the students, who are getting the benefit of what appears to be, everybody agrees, is a very, very extraordinary education that far surpasses the education that students not just in this county but in this state receive."

Finally, defendants contend that the trial court impermissibly directed a particular outcome. They again claim that the court was restricted to deciding whether the District considered academic achievement and was not to assess how the District considered this factor. They declare that the court should have remanded the matter back to the District if it concluded that the District failed to consider academic achievement in violation of section 47607, subdivision (c)(2).

The trial court had a limited question before it: Should it issue a preliminary injunction? The court answered this question in the affirmative after it balanced the harm AIMS would suffer if it did not issue an injunction by the hardships the District would suffer if it granted the injunction and after it determined that AIMS had demonstrated a likelihood of prevailing on the merits at trial. The issue before the court was not whether AIMS would actually prevail and it properly resolved the question of whether a preliminary injunction should be issued.

### V. *Funding the Charter Schools Pending Appeal of the Revocation Decision*

Defendants insist that the grant of the preliminary injunction was an abuse of discretion because it permits AIMS to continue operating during the pendency of the appeal process.[16] Defendants assert that the Education Code bars charter schools from

---

[16] As noted earlier, Educational Legal Alliance makes essentially the same argument when it claims that the trial court erred in finding that the balance of harms weighed in favor of AIMS. It maintains that the statute permits charter schools to remain open during the appeal of the revocation decision when the revocation is not based on a legal violation or fiscal mismanagement. It stresses that the Legislature mandated that there be no continued funding when there is fiscal mismanagement or a legal violation, and therefore the hardship of disruption will always occur. Education Legal Alliance maintains that any complaint regarding the undue burden resulting from closing the charter schools should be directed towards the Legislature.

As discussed below, we do not agree with Educational Legal Alliance that the statute absolutely bars funding during the pendency of the appeal when the revocation is based on fiscal mismanagement or a legal violation. Moreover, the burden caused by closing the charter school is not uniform. The closing of three charter schools where the students' academic achievement has been outstanding has a different consequence for the students and the community than the closing of charter schools where the students have low API scores.

continuing to operate during the appeal process when the charters were revoked for fiscal mismanagement, and they cite section 47607, subdivisions (i) and (j).

Section 47607, subdivision (i) provides: "(i) During the pendency of an appeal filed under this section, a charter school, whose revocation proceedings are based on subparagraph (A) or (B) of paragraph (1) of subdivision (c), shall continue to qualify as a charter school for funding and for all other purposes of this part, and may continue to hold all existing grants, resources, and facilities, in order to ensure that the education of pupils enrolled in the school is not disrupted." Section 47607, subdivision (c)(1) states in relevant part: "A charter may be revoked by the authority that granted the charter under this chapter if the authority finds, through a showing of substantial evidence, that the charter school did any of the following: [¶] (A) Committed a material violation of any of the conditions, standards, or procedures set forth in the charter. [¶] (B) Failed to meet or pursue any of the pupil outcomes identified in the charter." (§ 47607, subds. (c)(1)(A) & (B).) Under subdivision (c)(1), a charter may also be revoked for failing "to meet generally accepted accounting principles, or engag[ing] in fiscal mismanagement" or for violating "any provision of law." (§ 47607, subds. (c)(1)(C) & (D).)

Defendants contend that the language of section 47607 reveals an intent to prohibit any continued funding during the appeal process when the charter is revoked for fiscal mismanagement or legal misconduct, which were found in the present case. Defendants assert that subdivision (i) of section 47607 "provides that charter schools revoked for a violation of the charter or failure to meet pupil outcomes *may* continue to receive funding and to qualify as a charter school pending appeal. But [this provision] also states that charters revoked for legal or financial misconduct may not continue operations during the appeal process." (Italics added.)

Defendants' reading of subdivision (i) of section 47607 is clearly inaccurate. Subdivision (i) of section 47607 does not state that the funding "may" continue under certain circumstances and "may" not continue for legal or financial misconduct. Rather, the statute specifies that the funding "shall" continue when based on a material violation of a condition in the charter or on a failure to meet the pupil outcomes identified in the

31

charter. (§ 47607, subd. (i).) Thus, when revocation is based on these violations, funding *must* continue during the pendency of the appeal. The statute is silent regarding funding during the pendency of the appeal when the revocation is based on a legal violation or fiscal mismanagement.

Defendants also cite to subdivision (j) of section 47607 to support their construction of the statute. This provision specifies the following: "Immediately following the decision of a county board of education to reverse a decision of a school district to revoke a charter, the following shall apply: [¶] (1) The charter school shall qualify as a charter school for funding and for all other purposes of this part. [¶] (2) The charter school may continue to hold all existing grants, resources, and facilities. [¶] (3) Any funding, grants, resources, and facilities that had been withheld from the charter school, or that the charter school had otherwise been deprived of use, as a result of the revocation of the charter shall be immediately reinstated or returned." (§ 47607, subd. (j).) This provision provides that any funding that had been withheld is restored upon the county board of education's decision to reverse the school district's decision to revoke the charter. Defendants argue, "By necessary implication, if a county board upholds a revocation, a charter school is *not* eligible for continued funding[.]"

Section 47607, subdivision (j) does not suggest, as defendants assert, that a charter school is not eligible for continued funding if the county board of education affirms the decision to revoke. This statute ensures that all funding and resources that had been withheld based on the revocation must be restored once a decision to revoke is reversed. The statute does not address the situation where the county board affirms the decision to revoke.

"When a statute is silent on a point, the courts resort to statutory interpretation." (*Waterman Convalescent Hospital, Inc. v. State Dept. of Health Services* (2002) 101 Cal.App.4th 1433, 1439.) If the Legislature had intended to bar funding during the pendency of an appeal when the revocation is based on fiscal or legal violations, it could have so specified.

32

Our review of the legislative history of subdivision (i) of section 47607 (Assem. Bill No. 2030), reveals that this provision was added to ensure that the education of pupils enrolled in the charter school would not be disrupted and to protect the due process interests of the charter schools. (See Assem. Bill No. 2030 Analysis of Assem. Bil1, page 4, Enrolled Bill Rep., p. 3.) There was also, however, a countervailing concern with protecting students when the charter school violated the law or where the charter school's failure posed a severe and imminent threat to the health or safety of the pupils. (*Ibid.*)

In balancing the foregoing concerns, the Legislature crafted a bill that required funding when the charter school committed a material violation of the charter or failed to meet a pupil outcome in the charter. Presumably, in such situations it could be presumed that not disrupting the children's instruction trumped any concerns that the school posed any threat to the health or safety of the pupils. The statute does not require funding when revocation is based on fiscal mismanagement or a violation of the law but it does not suggest that funding can *never* continue in such situations or that it can be automatically presumed that continued funding in such situations poses a severe threat to the school's children or the public.

Policy considerations do not weigh in favor of the interpretation urged by defendants. Clearly the Legislature recognized the drastic consequences of disrupting instructional services to the students at charter schools if funding were halted during the appeal of the revocation decision. Children at charter schools would not be protected if courts have no discretion to use their equitable power to maintain the status quo during the pendency of the appeal when revocation is based on fiscal mismanagement or a legal violation. Policy supports an interpretation of the statute that provides the court with discretion to maintain the status quo after it has balanced the hardships and assessed the charter school's likelihood of prevailing in overturning the revocation decision.

If unable to seek a preliminary injunction in cases like the present, the initial administrative decision to revoke would always shut down a school. Thus, whenever fiscal mismanagement was alleged and found by the administrative agency to be supported by the evidence, funding would be discontinued and the charter school would

33

be forced to close.  Subsequently, if the SBE or court reversed the revocation decision, the charter schools and, most importantly, their students would have already suffered harm as the instructional services would have halted and the school's staff and instructors would have sought alternative employment during the appeal process.  Thus, public policy does not support a construction of the statute that would prohibit a court from evaluating the equities of the situation and determining whether the status quo should be maintained while the charter school appeals the decision to revoke the charter based on fiscal mismanagement or a legal violation.

We affirm the trial court's finding that it had the authority to issue an injunction that continued the funding to AIMS's charter schools while AIMS pursued its administrative and court challenges to the District's revocation decision.

## VI. *Jurisdiction*

Defendants argue that the trial court's preliminary injunction order prematurely and incorrectly usurped jurisdiction over the revocation decision from the SBE.  They maintain that the court did not have jurisdiction over AIMS's request for a preliminary injunction because AIMS had not exhausted its administrative remedies.

A charter school has the right to appeal the board's decision to revoke to the county board of education (§ 47607, subd. (f)(1)) and to the SBE (§ 47607, subds. (f)(2) & (3)).  In the present case, AIMS appealed to the County Board and, while this appeal was pending, it filed a petition for writ of mandate under Code of Civil Procedure sections 1085 and 1094.5 in the superior court.  AIMS filed its request for a preliminary injunction while the appeal before the County Board was pending.  The trial court granted the preliminary injunction after the County Board affirmed the decision to revoke, but prior to AIMS's administrative appeal to the SBE.

When remedies before an administrative forum are available, a party must in general exhaust them before seeking judicial relief.  (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 (*Coachella Valley*).)  Exhaustion requires "a full presentation to the administrative agency upon all issues of the case and at all prescribed stages of the

administrative proceedings." (*Bleeck v. State Board of Optometry* (1971) 18 Cal.App.3d 415, 432.) " 'The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary).' " (*Coachella Valley,* at p. 1080.) The exhaustion doctrine is a fundamental rule of procedure and "not a matter of judicial discretion." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293.)

Education Legal Alliance argues that the injunction intruded on the discretion provided by the statutes to the SBE and boards of education to oversee the educational system. It maintains that the Legislature must have been aware of the duties provided to the SBE and boards of education and made no express exemption from the exhaustion doctrine. (See *Grant v. Superior Court* (1978) 80 Cal.App.3d 606, 609.)

The exhaustion doctrine, however, has certain judicially created exceptions. (*Coachella Valley, supra,* 35 Cal.4th at p. 1080.) The doctrine does not apply when the administrative remedy is inadequate. (*Los Angeles County Employees Assn. v. County of Los Angeles* (1985) 168 Cal.App.3d 683, 686.) For example, it does not apply when irreparable harm would result if judicial intervention were withheld until a final administrative decision is rendered. (*Alta Loma School Dist. v. San Bernardino County Com. On School Dist. Reorganization* (1981) 124 Cal.App.3d 542, 555; see also *Greenblatt v. Munro* (1958) 161 Cal.App.2d 596, 605-606.)

Here, the trial court found irreparable harm would result unless it issued a preliminary injunction to maintain the status quo. The court stressed that AIMS had demonstrated that it would lose its faculty and student body if the injunction were not granted. Additionally, the students at the AIMS schools would be "deprived of the opportunity to obtain an education at schools that have enabled those students to obtain high API and SAT test scores." The record clearly supports the trial court's finding that the irreparable harm exception to the exhaustion doctrine applies.

35

Defendants argue that the superior court's ruling caused the SBE to lose jurisdiction and thus the court's order improperly usurped its jurisdiction and prevented it from performing its statutory duty. In support of this argument, defendants requested that we take judicial notice of the CDE letter under Evidence Code section 452, subdivision (h). (See Evid. Code, § 452, subd. (h) [judicial notice may be taken of "[f]acts and proposition that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"].) In the CDE letter, the CDE advised the SBE that the trial court's order staying the implementation of the Resolution revoking AIMS's charter resulted in the SBE's no longer having jurisdiction to review AIMS's appeal. AIMS opposed the request for judicial notice.

We grant judicial notice of the CDE letter for the limited purpose of showing that the CDE took the position that the SBE did not have jurisdiction to review AIMS's appeal. We, however, reject defendants' request to the extent they claim that this letter "prove[s]" the SBE did not have jurisdiction to hear the appeal. The CDE's legal conclusions clearly do not satisfy the requirements of Evidence Code section 452, subdivision (h).[17]

Defendants contend that even though the trial court expressly stated that its findings were "preliminary" and that it was simply maintaining the status quo, its order caused the SBE to lose jurisdiction. We disagree. The granting of a preliminary injunction whether it be prohibitory or mandatory in nature does not amount to an adjudication of the ultimate rights in controversy. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.) "The general purpose of such an injunction is the preservation of the status quo until a final determination of the merits of the action." (*Ibid.*) Here, the preliminary injunction was necessarily of limited scope; it prohibited

---

[17] The CDE stated that "[a]s a result of the [trial court's] order, AIMS cannot presently be considered a revoked charter school within the meaning of [t]itle 5 of California Code of Regulations section[s] 11968.5.4-11968.5.5." The CDE's legal conclusion is puzzling since these regulations simply set forth the procedure for revoking a charter.

36

closure of the three charter schools and ordered continued funding. The court did not reverse the resolution revoking the charter. Rather, it temporarily restrained the enforcement of the resolution. The order had no effect on the SBE. This order did not cause the SBE to lose jurisdiction and it did not prevent the SBE from performing its duty. The SBE chose not to consider AIMS's appeal.[18]

Education Legal Association maintains that this preliminary injunction thwarts the purpose of the exhaustion process and would open the judicial floodgates to those impatient with administrative review. It cites *Board of Police Commissioners v. Superior Court* (1985) 168 Cal.App.3d 420 (*Board of Police Commissioners*) in support of its argument that the exhaustion doctrine cannot be circumvented by bringing an action for injunctive relief. (*Id.* at p. 499.)

We agree that courts ordinarily cannot issue a preliminary injunction prior to the completion of the administrative process. When no exception to the exhaustion doctrine applies, permitting an injunction would result in parties bypassing administrative agencies, clogging the courts, and making administrative agencies impotent. (*Board of Police Commissioners, supra,* 168 Cal.App.3d at p. 432.) However, the court in *Board of Police Commissioners* expressly stated that none of the exceptions to the exhaustion doctrine applied in the case before it. (*Id.* at p. 432.)

In contrast to the situation in *Board of Police Commissioners*, here, the irreparable harm exception to the exhaustion doctrine applies. Permitting a preliminary injunction when the exception applies will not overburden the courts since injunctions would be granted only when equity demanded relief to prevent the irreparable harm that would result if an injunction were not issued.

Finally, defendants argue that the trial court incorrectly ruled it could stay the operation of an administrative order or decision pending completion of judicial proceedings pursuant to Code of Civil Procedure section 1094.5, subdivision (g). This

---

**18** We need not address AIMS's argument that the failure to exhaust administrative remedies is moot because the SBE was not required to respond to AIMS's appeal and the time for it to respond has expired.

statute requires the court to weigh the public interest and the court's order, according to defendants, did not do that. Additionally, defendants maintain that a Code of Civil Procedure section 1094.5, subdivision (g) applies to a proceeding under Code of Civil Procedure section 1094.5, and it is "the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal . . . ." They argue that a hearing to revoke a charter does not require an evidentiary hearing and therefore traditional mandate applies, not Code of Civil Procedure section 1094.5. (See *Today's Fresh Start, supra,* 57 Cal.4th at p. 228.)

Defendants cite to *Today's Fresh Start, supra,* 57 Cal.4th 197, but ignore that the charter school in *Today's Fresh Start* had challenged its charter revocation by filing a petition for writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5. (*Today's Fresh Start,* at p. 210.) The charter schools then moved for judgment under Code of Civil Procedure section 1094, and the trial court granted the motion on the basis that the charter school's due process rights had been violated because the decision to revoke was not made by an impartial adjudicator and the evidence in support of revocation had not been introduced at the public hearing. (*Today's Fresh Start,* at pp. 210-211.) The Court of Appeal reversed, and the Supreme Court affirmed the Court of Appeal. (*Id.* at pp. 211, 231.) In affirming the Court of Appeal's judgment, the Supreme Court never suggested that the writ petition should not have been brought pursuant to Code of Civil Procedure section 1094.5. Indeed, it cited Education Code section 47607, subdivision (e), which requires a public hearing to consider whether evidence exists to revoke the charter. (*Today's Fresh Start,* at p. 228.) The court simply held that the public meetings did not have to be "formal evidentiary hearings" as, "[i]n general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action.' " (*Ibid.*)

Code of Civil Procedure section 1094.5 does not require a "formal evidentiary hearing," and, here, a hearing was given, and evidence was required to be taken. Education Code section 47607, subdivision (e) requires a chartering authority to "provide

a written notice of intent to revoke *and notice of facts in support of revocation*" prior to any revocation. (Italics added.) This provision also requires a public hearing "on the issue of whether evidence exists to revoke the charter." (§ 47607, subd. (e).) The charter authority then must issue a final decision and, if revoking, it must make "written factual findings supported by substantial evidence, specific to the charter school, that support its findings." (*Ibid*.)

Defendant's attack on the trial court's citation to Code of Civil Procedure section 1094.5, subdivision (g) also lacks merit. This statute provides that except in situations not relevant to the present case, "the court in which proceedings under this section are instituted may stay the operation of the administrative order or decision pending the judgment of the court . . . . However, no such stay shall be imposed or continued if the court is satisfied that it is against the public interest." (Code Civ. Proc., § 1094.5, subd. (g).) This statute "unequivocally requires the superior court weigh the public interest in each individual case." (*Sterling v. Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 176, 187.) The court in the present case clearly weighed the public interest when considering whether to grant the request for a preliminary injunction. As already discussed, the court emphasized that the denial of the preliminary injunction would injure the three charter schools and the students at those schools. The court noted that defendants identified financial irregularities in the past management of the AIMS schools but failed to identify "any specific threat of future financial irregularity." The court explained that it could implement an equitable solution by crafting "a preliminary injunction that [would] permit the [District] to more carefully monitor and regulate the financial management of the AIMS schools while AIMS pursues its administrative appeals." Thus, the record showed that the court weighed the public interest prior to deciding to grant the preliminary injunction.

Accordingly, we conclude that the trial court had jurisdiction to issue a preliminary injunction.

## VII. *The Absence of the CDE*

Defendants contend that we should reverse the order granting the preliminary injunction because the CDE was not a party in the preliminary injunction action. They maintain that the CDE was an indispensable party.

Code of Civil Procedure section 389 requires that a person be joined as a party "if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." (Code Civ. Proc., § 389, subd. (a).) A person meeting these requirements is often referred to as a "necessary party." (*Bowles v. Superior Court* (1955) 44 Cal.2d 574, 583.)

"If a person is determined to qualify as a 'necessary' party under one of the standards outlined above, courts then determine if the party is also 'indispensable.' Under this analysis 'the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder.' (Code Civ. Proc., § 389, subd. (b).)" (*City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 83-84.)

"None of these factors is determinative or necessarily more important than another. [Citations.] Further, the court's consideration of these factors largely depends on the facts and circumstances of each case. [Citation.] 'Whether a party is necessary

40

and/or indispensable is a matter of trial court discretion in which the court weighs "factors of practical realities and other considerations." ' [Citation.] 'A court has the power to proceed with a case even if indispensable parties are not joined. Courts must be careful to avoid converting a discretionary power or rule of fairness into an arbitrary and burdensome requirement that may thwart rather than further justice.' [Citation.]" (*City of San Diego v. San Diego City Employees' Retirement System, supra,* 186 Cal.App.4th at p. 84.)

Defendants maintain that because the CDE is the agency responsible for funding public schools, it had an interest that could not be protected adequately. (See *Redevelopment Agency v. Commission on State Mandates* (1996) 43 Cal.App.4th 1188, 1192, 1197 (*Redevelopment Agency*) [the State of California Department of Finance was an indispensable party and a proper real party in interest in proceedings by a city's redevelopment agency against the Commission on State Mandates challenging the commission's ruling that the agency was not entitled to reimbursement for housing costs the agency had incurred].) They claim that the need for the CDE was "demonstrated by the fact that the [o]rder prematurely terminated the revocation appeals process and divested the SBE of jurisdiction over the appeals process."

We agree with the superior court that its order had no effect on the obligations and options of the CDE and the order did not prejudice the CDE. Rather, the order simply required the charter to remain in effect and the CDE's obligations and options remained the same.

The cases cited by defendants are inapplicable. (*Serrano v. Priest* (1976) 18 Cal.3d 728, 751-753 [Legislature and Governor were not indispensable parties in a challenge to the constitutionality of school financing system because state officers with statewide administrative functions under the challenged statute were the proper parties defendant]; *Butt v. State of California* (1992) 4 Cal.4th 668, 673-674 [Supreme Court affirmed preliminary injunction order to the extent it ordered a school district short on funding to remain open for the final six weeks of the school year but reversed the order to the extent it approved the diversion of emergency loan funds from appropriations

41

intended by the Legislature for other purposes]; *Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 888-889 [court held that the judiciary had no general authority to compel appropriations or second guess legislative spending decisions in a lawsuit by a high school alleging that the Legislature was not providing enough funding for special education].)  The state was a party in all of the foregoing cases and the court did not have to consider whether the state was an indispensable party.  Moreover, these cases, including *Redevelopment Agency, supra,* 43 Cal.App.4th 1188, an additional case cited by defendants, involved a challenge to an appropriation decision.  No such challenge is present here.  The preliminary injunction in the present case stayed a revocation decision.

Finally, even if the court had determined that the CDE was a necessary party, the court's decision to go forward without the CDE was not an abuse of discretion.  Nothing in this record shows that in the absence of the CDE the trial court could not accord complete relief among those already parties to the action.  AIMS did not seek any relief in its request for an injunction or in its underlying mandate action that depended on joinder of the CDE.  AIMS's petition sought to reverse the revocation action, which did not involve the CDE.

## DISPOSITION

The order granting the preliminary injunction is affirmed.  Defendants are to pay the costs of appeal.

42

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*






* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.



A139652, *American Indian Model Schools v. Oakland Unified School District et al.*

Trial Court:                                      Alameda County Superior Court

Trial Judge:                                      Hon. Evelio Grillo


Attorneys for Defendants and Appellants          Office of General Counsel
                                                 Jacqueline P. Minor

                                                 Burke, Williams & Sorensen
                                                 John R. Yeh
                                                 Amy E. Hoyt

Attorneys for Plaintiff and Respondent           Weintraub, Tobin, Chediak, Coleman,
                                                 Grodin Law Corporation
                                                 Alex James Kachmar, Jr.
                                                 Brendan J. Begley

                                                 Procopio, Cory, Hargreaves & Savitch
                                                 Gregory V. Moser
                                                 Alyssa Aiko Yamakawa
                                                 Adriana R. Sanchez


Attorneys for Amicus Curiae on behalf            Liberty Cassidy Whitemore
of Defendants and Appellants                     Laura Schulkind
                                                 Megan M. Lewis

                                                 California School Boards Association/
                                                 Education Legal Alliance
                                                 Keith Bray
                                                 Joshua R. Daniels