Filed 10/28/25  P. v. Cruz CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B332151 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA153495) |
| v. | |
| JONATHAN CRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Jonathan Cruz (defendant) appeals from a judgment entered after a jury trial. He contends the judgment should be reversed because the prosecutor improperly excluded prospective jurors based on their Hispanic ethnicity.[1] We find, upon evaluation of the reasons given and in light of the totality of the circumstances, the trial court did not err in overruling defendant's objections to the prosecutor's peremptory challenges because there was not a substantial likelihood that an objectively reasonable person would view ethnicity as a factor in the use of the peremptory challenges. We therefore affirm the judgment.

**STATEMENT OF THE CASE**

In an amended information, the Los Angeles County District Attorney's Office charged defendant with the following: count 1, conspiracy to commit murder in violation of Penal Code section 182, subdivision (a); count 2, the murder of Raul Avalos, in violation of section 187, subdivision (a); count 3, the willful, deliberate, and premeditated attempted murder of Ana R., in violation of sections 187, subdivision (a) and 664; and count 6, possession of a firearm by a felon, in violation of Penal Code section 29800, subdivision (a)(1).[2]

---

[1]    In this opinion, we use the term "Hispanic" to refer to individuals who appear to be of Latin American descent, as did the participants during trial. We use the term "Black" to refer to individuals who appear to be of African-American descent. We use the term "Asian" to refer to individuals who appear to be of Asian descent, and "White" to refer to individuals who appear to be of European descent. No disrespect is intended to any individual or any racial or ethnic group.

[2]    The information also charged defendant's codefendants, Alfonso Keer, Daniel Ortega, Roy Sanchez, and Jaime Chacon,

2

As to counts 1 through 3, the information alleged prior conviction special allegations under Penal Code sections 667, subdivision (a)(1), and 1170.12, subdivision (b), as well as criminal street gang special allegations under section 186.22, subdivision (b)(1)(C).

As to count 2, the information alleged firearm special allegations under Penal Code section 12022.53, subdivisions (b) through (d), as well as a section 190.2, subdivision (a)(10) special circumstance.

As to count 3, the information alleged firearm special allegations under Penal Code section 12022.53, subdivisions (b) and (e)(1).

Defendant pled not guilty and denied all of the special allegations.  The People subsequently informed the court they would not be proceeding with the gang allegations or the prior conviction allegations.

On April 26, 2023, defendant withdrew his plea of not guilty to count 6 and entered a plea of nolo contendere to the charge.

A jury trial was held on the remaining counts and special allegations.  On May 30, 2023, the jury found defendant guilty on counts 1 and 2, and not guilty on count 3.  The murder was found to be in the first degree, and the Penal Code section 190.2, subdivision (a)(10) special circumstance and section 12022.53, subdivision (b) special allegation was found to be true.

The jury concluded the Penal Code section 12022.53, subdivisions (c) and (d) special allegations were not true.

who were tried separately from defendant.  Rodrigo Trevizu, another codefendant who was charged in counts 1 and 2, was acquitted by the jury and is not a party to this appeal.

3

On July 28, 2023, the court sentenced defendant to an aggregate term of life in prison without the possibility of parole. Defendant appealed.

## FACTUAL SUMMARY

Roy Sanchez and Avalos lived at Candido Ramirez's house and sold methamphetamine for Ramirez.

In 2019, Sanchez met William Pojoy at a store. Pojoy took him to a house where Keer was located. Later Sanchez began to hang out with Keer, who learned Sanchez was selling drugs for Ramirez. Keer wanted Sanchez to sell drugs for him instead. Keer provided Sanchez with a black Nissan Sentra to drive and offered him construction jobs. Eventually, Sanchez began to sell drugs for Keer.

Through Keer, Sanchez met Ortega, defendant, and defendant's brother, Trevizu, who were members of the Southside Watts gang. Keer was in charge of the drug sales for the group, which included Jaime Chacon as well. Guns and drugs were kept at Chacon's house. Ortega served as Keer's support, like a "security guard."

In 2019, Sanchez got drugs from Keer and sold them to Avalos. Since Avalos did not have money to pay for the drugs at the time, he told Keer he would pay him on Friday. Keer did not agree and wanted the money right away. Sanchez was at Ramirez's house when Keer, Chacon, and Ortega came to get the drugs back from Avalos. They got the drugs back but told Avalos he still owed them some money. Keer and Chacon told Avalos they wanted him to sell drugs for them, and Avalos would have to pay "taxes" or "rent" for "protection."

Keer later brought up with Sanchez the issue of Avalos paying taxes. Keer asked Sanchez if he was going to "take care of that," which Sanchez understood to mean he had to either get Avalos to pay taxes or shoot Avalos.

On July 2, 2019, Sanchez was at home with Ramirez and Avalos. Avalos and Sanchez had done drugs together that evening. Pojoy arrived armed at the house. Pojoy asked Sanchez if he was going to be a team player and handle what he needed to handle. Sanchez felt threatened by Pojoy and believed if he did not shoot Avalos, he too would be shot. As a result, Sanchez shot Avalos with a .357 revolver. The bullets hit Avalos in the arm and leg, and Avalos ran away. Sanchez ran in the opposite direction to a house where Keer used to take him.

Sanchez called Keer, who came and picked him up. Sanchez gave Keer the gun. From that point until he was arrested, Sanchez lived with Chacon and Keer. Avalos told police Sanchez had shot him. He identified Sanchez from photographs shown to him by the police.

On July 15, 2019, Sanchez went to Ramirez's house, where Ramirez told Sanchez he was going to call the police and to leave. Sanchez stayed until the police arrived and was arrested.

On July 16, 2019, Sanchez called Keer from jail and stated he had been arrested after having been identified by people he used to live with. He wanted Keer to talk to Avalos and Ramirez and tell them to stop saying he shot Avalos. Sanchez also called Ramirez the same day and begged Ramirez to convince Avalos to change his story about who shot him.

Sarai Barba was Trevizu's girlfriend. Trevizu, Barba, defendant, and defendant's family were living together in the summer of 2019. On July 20, 2019, Barba was at home with

5

Trevizu and defendant and his family. Defendant came into her room and asked Trevizu for a ride. Trevizu and Barba drove defendant in Barba's Nissan Armada to meet Ortega, who was driving a GMC Envoy. Defendant and Trevizu got into the Envoy and rode to Chacon's house. Chacon came out and eventually, Chacon, Ortega and defendant left in the Envoy, and Barba got back in her Armada.

Ana, a friend of Avalos, was at Ramirez's house with Avalos on July 20, 2019. Ana went outside to get paint to help paint Avalos's room. While outside she saw "two individuals that were dressed in black." They went to Avalos's room, and each took out a gun and began shooting at Avalos. Ana ran to Avalos's room and yelled, and Avalos ran to the bathroom. One of the shooters followed Avalos. The other pointed a gun at Ana. Ana was told to be quiet after they stopped shooting Avalos, who died as a result of the shooting. In total, Avalos was shot seven times.

At the time of the shooting, Trevizu had called Barba. During the phone call, Barba heard gunshots. Trevizu told her to be ready to follow him. Trevizu then arrived in the Envoy, and Barba followed him to the area where Ortega's car was parked. Defendant exited Ortega's car and went with Trevizu and Barba in the Armada. Surveillance recordings were used to connect Chacon's car, the Envoy, and Barba's Armada to the murder. Social media accounts belonging to Keer, Ortega, Chacon, Trevizu, Sanchez, and defendant also supported their involvement in the murder.

After Avalos was killed, Ana informed the police two Hispanic males in dark hoodies and ski masks had shot Avalos. The man who pointed a gun at her tried to shoot her too, but he was out of bullets. Avalos mentioned to Ana that Keer confronted

6

him about paying rent before Sanchez shot him.  In addition, Avalos informed her Keer wanted to control the neighborhood.

Following Trevizu's arrest on November 5, 2019, he was placed in a holding cell with a *Perkins* agent.[3]  He told the agent he was not one of the shooters but admitted being one of the drivers during the Avalos murder.  When asked what defendant had to do with the murder, Trevizu identified defendant as the one.  Trevizu said the shooting targeted someone who snitched on Sanchez, and he identified the two shooters as defendant and Ortega, who he said were sent by Keer.

### RELEVANT PROCEDURAL HISTORY

Jury selection began in April 2023, with two panels of prospective jurors totaling 99 people.  Thirty-eight were subject to voir dire.

**J1906[4]**

Early in the proceedings, J1906 asked to be relieved from jury service due to financial difficulties.  J1906 worked full time as a staff accountant at a hotel and lived at home, where she paid a share of the rent to her mother.  Her employer paid only for three days of jury service.  The court noted many employers will assist their employees when it comes to jury service, so J1906 agreed to speak with her employer and stick with the process to see how it went.

---

[3]      *Illinois v. Perkins* (1990) 496 U.S. 292.

[4]      Prospective jurors will be referred to by the letter "J" followed by the four-digit number by which they are identified in the record.

Later, J1906 stated she was engaged, had no adult children, and lived in Hawthorne. She worked in accounting, and her fiancé worked in engineering. J1906 had never served on a jury.

J1906 said her fiancé's car had been broken into the previous year and some property was stolen, but they did not report the incident to the police. Her future mother-in-law's car was also stolen, and the car was not recovered. Neither incident would prevent her from being fair and impartial. J1906 was not bothered by Trevizu's appearance.

Counsel for defendant equated the ingredients of a peanut butter and jelly sandwich to the elements of a crime the prosecution had to prove. When asked how she would feel if the prosecution gave them peanut butter and jelly but not bread, J1906 said they had not met their burden of presenting a complete sandwich.

Counsel for defendant also gave a hypothetical in which the jurors were to imagine they were hanging out with a friend at a bar and, out of the juror's presence and without her knowledge, the friend gets into a fight and is later charged with assault. J1906 said it would be unfair to charge the juror as an accomplice under the circumstances.

One of the prosecutors used a hypothetical in which four people agreed to rob a bank and, while two actually committed the crime, one acted as a lookout and the fourth individual acted as the getaway driver. The prosecutor asked if the jurors felt it was fair that, under California law, all four are guilty of robbery. The prosecutor also asked the jurors their feelings about the hypothetical suspects' criminal liability for the separate crime of conspiracy. J1906 had no issues with the crime of conspiracy.

J1906 was also asked about her view of a witness with a motive to lie. J1906 said she would not automatically assume the witness was lying but would look at the evidence first.

**J5861**

Like J1906, J5861 asked early in the proceedings to be excused from service. She worked one-on-one as an instructional assistant for a special needs student. She was required to be with her student "all the time," and it would be strange for the student to be without her. Her student was being watched by the vice principal while J5861 was at jury duty due to short staffing at the school. The court asked that she keep an open line of communication with her principal and see that they make accommodations for the student.

J5861 lived in Paramount, was divorced, and had no children. Her ex-husband was an electrician. She had never previously served on a jury. Nothing about the case led her to believe she could not serve as a juror.

The prosecutors asked J5861 about the robbery hypothetical, and she said she did not have a problem following the law on aiding and abetting or conspiracy. She also told the prosecutors she would not assume someone is lying based on motive alone and would have to look at the evidence.

**J2298**

J2298 initially asked to be relieved from service. She was taking care of two boys whose parents were in Maine for two weeks. She was also scheduled to take care of the boys for a week in June. J2298 was a retired nurse who had previously worked in a nursing home. The boys were the adopted children of her nephew. The judge declined to excuse J2298 for this reason.

9

J2298 lived in Lakewood. She was single with no adult children. She served on a jury before, but it had been a long time ago and she could not recall if it was a criminal or civil case. She did recall the jury deliberated and reached a verdict. Nothing about this case would prevent her from being impartial.

**J0955**

J0955 informed the court early on that she could not commit to the time required for the trial due to a financial hardship. She just got a job at a hotel where she refreshed minibars. She also worked as a freelance photographer, lived at home and did not pay rent. The court asked J0955 to speak with her employer. She said she would but that she had a "huge debt-collector issue," and the hotel job was nine to five.

During voir dire, J0955 said she lived in Hawthorne, was single, and had no children. Four years ago, she served on a jury in a civil trial, which reached a verdict. Four or five years ago, she had her photography kit stolen while she was working. She also went to a Black Lives Matter protest and got slammed against a police car for peaceful protesting, which was a negative experience. She suffered bruises, and the police involved were from the Los Angeles Police Department. She believed, however, she could be impartial. J0955 had been to other Black Lives Matter protests, as well as protests about reclaiming indigenous lands. J0955 did not necessarily believe Trevizu would be lying if he testified, and she had no particular feelings about him if he did not testify. J0955 would be able to follow the law.

**J9442**

J9442 was a single male with no children who lived in Paramount. He worked in food preparation for a private company. He had never served on a jury. His car had been

10

broken into three years prior. Nothing was taken from it, and he never called the police. The incident would not prevent him from being a fair and impartial juror.

J9442 had worked in food preparation for three years since finishing high school. He did not live at home or have roommates. He had no hobbies and did not belong to any clubs or organizations. He watched television, mostly cartoons.

J9442 believed it was human nature to prejudge people. Trevizu's appearance gave him the impression he was a gang member. However, J9442 still believed that a defendant was innocent until proven guilty, and the prosecutor was required to prove that a defendant actually committed a crime. J9442 acknowledged having a tattoo that was not visible.

The defense attorney asked J9442 about the hypothetical involving the bar fight. J9442 said it would be unfair for the juror to get charged as an accomplice under the circumstances. One of the prosecutors presented the hypothetical about the bank robbery and asked if it was fair that all four individuals were guilty of robbery. J9442 responded that there was nothing wrong with that, it was the law. J9442 also indicated he would follow the law on conspiracy.

One of the prosecutors asked J9442 about assessing the credibility of a witness who has a motive to lie. J9442 stated a motive does not necessarily mean the witness is lying and he would have to evaluate the witness's credibility through other factors, such as how he answered the questions asked of him.

**J5432**

J5432 lived in Carson, was single, and had no children. He worked as a saw operator and a security guard. He had never served on a jury. He grew up in a neighborhood with gangs, had

friends murdered in gang-related violence, and had friends associated with gangs. However, he did not believe that would affect his judgment, and he thought he could be fair and impartial.

When asked about Trevizu's facial tattoos, J5432 said he knew people with similar tattoos. Some were gang-affiliated, but others were not and just had alternative lifestyles. He had never been affiliated with gangs. However, he had seen gang tattoos. This would not prevent him from being fair and impartial to both sides.

J5432 responded to the prosecution's robbery and conspiracy hypotheticals. Regarding the robbery, J5432 said it was fair for all four participants to be charged and that he would follow the law on aiding and abetting. He also said he would follow the law on conspiracy.

After the jury was instructed on the law of circumstantial evidence, one of the prosecutors presented the jury with a photograph of a girl covered in paint and asked whether they could conclude from the photograph that the girl had gotten into the paint and covered herself with it. J5432 said that conclusion was an assumption, that someone could have thrown the paint on her, and "[w]e don't know" how it happened from "just a picture." He said it was possible the girl played in the paint, but he could not tell based on the photograph alone.

**J9951**

J9951 lived in South Los Angeles, was single, and had no adult children. She worked as a mental health therapist and had never served on a jury. Her work was with a nonprofit organization, and it catered to court-mandated clients between the ages of eight and 56 years old. Through her work, she

12

communicated with attorneys, social workers, probation officers, and the police. She said she would not automatically believe or disbelieve a witness based on the person's occupation and would assess each witness's credibility using the same standard.

J9951 was arrested in 2012 for driving under the influence. The matter had been expunged, and she believed she was treated fairly. The incident would not affect her ability to be fair and impartial.

Trevizu's appearance did not disturb her and would not prevent her from being fair. The prosecution asked J9951 what she thought about a witness with a motive to lie. She said she would not automatically assume such a witness was lying and would have to look at the evidence.

**Peremptories and objections**

### *J5432, J9951, J1906, J9442*

Following voir dire of the first 20 prospective jurors, the prosecutors exercised their first peremptory challenge against a white female juror. They then used their second challenge against a Black female juror.

The prosecution used its next two challenges to remove J5432 and J9951, respectively.

Nine additional jurors were then seated to fill vacancies among the 20 and subjected to the next round of voir dire, including J5861 and J2298. Following that round, the prosecution removed J1906 with their fifth peremptory challenge and J9442 with their sixth one. In response to the removal of J9442, defendant's attorney objected.

A hearing took place outside the presence of the jury. The court invited defendant's counsel to present his "prima facie argument." Defense counsel stated, "I believe the last four jurors

the People have kicked have been of Latino, Hispanic descent.  I believe this last one was a male Hispanic.  The one before that was a female Hispanic.  The one before that was a female Hispanic.  And the one before that was a male Hispanic."

Before beginning its analysis, the court asked defense counsel to clarify "the challenge is focused on [J]9442."  Defense counsel responded, "Correct."  The court noted "trying to guess somebody's ethnicity or race is very difficult."  However, he noted both defendants appeared to be Hispanic, and the judge identified as a White male.  Trevizu's counsel appeared to be a White male, and defendant's counsel appeared to be an Asian male.  As to the prosecutors, one appeared to be an Asian female and the other a White female.  One of the prosecutors clarified she was Filipino-Japanese.  The prospective jurors that were currently seated consisted of nine Hispanics, three Blacks, two Asians and three Whites.  The court noted there were "many male and female Hispanics" still in the group.  The court further noted, "Looking out in the audience which I have been able to do, we have many, many more Hispanic jurors both male and female along with other races that I can see.  They are too numerous.  I haven't really counted categories."

The court then reviewed the parties' peremptories.  It noted the prosecution's peremptories included one White, one Black, the third Hispanic, and as to J9951, the court had a question mark, noting J9951's name "doesn't appear to me to be a Hispanic name."  The court agreed the prosecution's fifth and sixth peremptories were Hispanic.

The court then reviewed the defense's peremptory challenges.  The defense removed a female Hispanic, White male, male Hispanic, Asian female, and male Hispanic.  So "three out

14

[of the defense's] five peremptories" were Hispanic, and the court noted "the overall picture can be the majority of our prospective jurors I believe are Hispanic."

Defense counsel pointed out the last four jurors also all appeared to be youthful, noting "it seems that the People are targeting a particular demographic."

While noting there had not been a prima facie case made, the court requested the People provide their reasoning for the record. The court clarified, "The reason I'm not making a prima facie showing is that both sides have used the majority of their peremptories with Hispanics. They are the far majority of the individuals on this panel." The court also noted "young people are not a protected class."

The prosecution addressed its rationale for excusing the four jurors defense counsel characterized as Hispanic. The prosecutor explained J9442 had "very little life experience which is still a neutral justification" to exercise a peremptory. J9442 worked in food preparation, was single with no kids, and watched television most of the time. The prosecutor noted, "Given the charges in this case and how serious [*sic*] we expect people to understand the relationships between everyone, I didn't feel he was an appropriate juror for this particular case notwithstanding his age."

As to J1906, who was characterized as a young female Hispanic, the prosecution took issue with the defense's characterization of the female as young, noting "[s]he's already an accountant. Her husband is an engineer. She is engaged. And she indicated that she has a financial hardship." The prosecutor noted, "This is a case where we expect the evidence to extend for quite some time and we don't want somebody on this

15

jury who is going to be concerned with their financial situation more than the evidence in this case." The prosecutor pointed out "she was somebody who responded early in the proceedings to claim that financial hardship in private with the parties."

The prosecution later added that J1906 was very soft-spoken and appeared to be someone that would be a "follower," which weighed into the decision to remove her.

As to J9951, a female who was possibly Hispanic, the prosecution also disagreed that she was young.[5] The prosecutor had estimated her age at 40. She was a mental health therapist who served court-mandated clients, therefore came in contact with the justice system. The prosecutor noted, "She seems to be somebody that I felt was too close to [the criminal justice system] as far as what she might know or what she might assume and bring into dealing with this jury. And based on that, I didn't think she would be a good fit for this jury . . . ."

As to J5432, a Hispanic male, the prosecutor had an estimated age of 30. The prosecutor felt that due to his feelings about the photograph of the girl in the paint, he might have an issue with circumstantial evidence. That was the reason the People exercised a peremptory challenge as to him.

Defense counsel countered that concerning J9442, "the belief that the juror doesn't have life experience or knowledge . . . could be construed to be a race-based reason . . . because opportunities and—professional opportunities, education is oftentimes more difficult to achieve in certain geographic locations if a person is raised in a particular neighborhood

---

[5]    As noted above, the court disagreed that she appeared Hispanic.

16

compared to being raised in a nicer neighborhood." Defense counsel also noted numerous jurors raised financial hardship, and it sounded like an arbitrary reason to justify excusing J1906.

Having heard the arguments, the court disagreed with defense counsel that the prosecution's peremptory challenge as to J9442 was race-based, finding "there is not a substantial likelihood that an objectively reasonable person would view the membership in the protected class which is the Hispanic class, . . . as a factor in the use of a peremptory challenge."[6]

### J5861

The prosecution next used a peremptory challenge on J5861. The court had noted J5861 was a female Asian. The questions indicated she was from Paramount, divorced, and was a teacher's aide. The court later agreed J5861's last name was "consistent" with her being "Hispanic," but later indicated, "Actually I think she is from the Philippines, Asian, Pacific Islander. I don't know how you would categorize her." Defense counsel argued she was in the same category as other jurors that the prosecution had been excusing. In addition, she appeared to be a very young potential juror.

The court noted that it wanted to add to the record that both victims in the case, Avalos and Ana, were Hispanic. It

---

[6]     One of the prosecutors attempted to raise the issue of jurors with hardships before the jury was called back in, stating, "We really did have issues with people who claimed that they have hardships. We want them concentrated on the case and not on their hardship. We have another juror coming up—," to which the court responded, "I don't want to discuss it. . . . Both sides have a right to the make challenges. I don't want people or either side for that matter putting out there so they don't get challenged, et cetera. We will take the challenges as they come."

17

further noted, "the far majority of the folks that are not only sitting on the panel but in the audience waiting to come up are Hispanic.  A lot of Compton cases are like that and . . . whenever we get a jury and six alternates will be primarily Hispanic, the same ethnic group as the defendants, same ethnic group as the victims in this case."  The court concluded, "This is not a situation where a class of people or a protected class is systematically being removed from the jury."

The prosecution disputed the defense's characterization of J5861 as "young," pointing out the prosecutor had her estimated age at 32.  In addition, the prosecutor understood the court's characterization of this female juror as Asian, noting, "[t]hat's possible."  The prosecution excluded her from the jury because she was an instructional aide to special needs students who were undergoing testing, and "it was our thinking that her mind would . . . not be in this case."  While the court had declined to excuse her for this reason, the prosecutor noted "it is something we take very seriously only because there is going to be very nuanced types of evidence in this case and we need them to be concerned about that and have no worries about what's going on outside of this courtroom when we are presenting our evidence."

Defense counsel noted J5861 did not note a financial hardship, only a concern about her students.  The court re-emphasized for the record it could not determine whether she was Hispanic or not.  Regardless of J5861's race, the court stated there was no "likelihood at all that an objective reasonable person would view the membership in a protected group as a factor in the use of the peremptory challenges because challenges are being made by both sides with not only that ethnic group, but all the others.  And this jury will ultimately be comprised just based

18

on its make-up of Hispanics. So for those reasons the motion is denied." The court noted its ruling would not change no matter what ethnic group J5861 was part of.

The prosecution added for the record that their last six peremptories had also been people without jury experience, which also weighed into their calculation. The prosecution also informed the court that age was a protected group, but that the prosecution had articulated other reasons for the previous peremptories.

In a discussion of the "new law" concerning peremptory challenges, the court indicated it was "aware of the presumptions" set forth in the new law and found there was "nothing . . . from the People in justifying their peremptories that are specifically as to the presumption which is now invalid." The court clarified *youth* is not the same thing as "lack of employment or underemployment," and the only juror excused for her employment was J9951. However, mental health workers like J9951 could be "people across the board in all types of ethnic groups and socioeconomic status."

### J2298

After the People excused J5861, they used their eighth peremptory challenge to excuse J2298. Defense counsel did not object.

### J0955

The prosecution used their next peremptory challenge for J0955. Defense counsel objected. Defense counsel described J0955 as a young female Hispanic who indicated she went to a Black Lives Matter protest. Defense counsel argued this was not a reason why she could not be a fair and impartial juror.

19

The prosecution stated its reason for removing J0955 was she indicated being on a jury for the length of this trial would pose a financial hardship on her. The prosecutor said "we didn't question her in regards to the Black Lives Matter because none of those things really were at issue with us. We are fine with that. But just the fact that she identified herself as someone who would have a hard time serving on this jury was the reason."

The court agreed the female Hispanic juror was in a protected class and that participation in a Black Lives Matter protest was a presumptively invalid reason to exclude her.

The court noted the prosecution had used the majority of its peremptory challenges on Hispanic jurors. The court further noted the prosecution seemed to be using financial or other inconvenience as "an excuse." The prosecutor defended her actions, stating "When someone singles themselves out to address the court and to remain in order to address the court, it signals to me that it is a significant . . . concern to her." J0955 "said she just got a new job and also was concerned about her financial hardship especially in light of [her] large debt, that is concerning to me only because . . . our particular case has a lot of nuances. It has a lot of circumstantial evidence. And it's something that requires a lot of attention." After the court inquired why her attention would be different, the prosecutor stated, "the fact that she is worried about this other situation of not being at work while she is here." The prosecutor noted there were still three to four young Hispanic females on the jury in the same demographic as J0955, which the prosecution had no intention of excusing. Looking at the names of the remaining jurors, there were many Hispanic names. The prosecution consistently used their peremptories for people who had financial hardships or who they

20

believed would be unable to focus on the testimony and the evidence.  The majority of the jury was still comprised of Hispanics.  The prosecution also noted the defendants are Hispanic, nearly all of the People's witnesses were Hispanic, and both victims were Hispanic.  Thus, there was no reason for the prosecution to excuse Hispanic jurors in this case.

The court noted it was "consistent in today's world in May of 2023 in Compton based just on the demographics of the area . . . it is predominantly Hispanic as is our panel is predominantly Hispanic."  The court stated its "ultimate analysis" as whether an objectively reasonable person would view the membership in the protected group as a factor in the use of the peremptory challenge.  The court did not feel the standard had been met.

Prior to trial, the prosecution requested the court put on the record the racial makeup of the jury.  The final jury, not including alternates, included seven Hispanics.  Including the alternates, there were 12 Hispanics, two Whites, one Asian, and three Blacks.

## DISCUSSION

### I.     Applicable law

"Peremptory challenges are 'designed to be used "for any reason, or no reason at all."'"  (*People v. Armstrong* (2019) 6 Cal.5th 735, 765.)  However, "[p]eremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender."  (*Ibid.*)

Until recently, there was a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden was on the opposing party to demonstrate impermissible

21

discrimination. (*People v. Armstrong, supra*, 6 Cal.5th at p. 766.) Courts would use a three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943 (*Jaime*).) "Recognizing the limitations of the *Batson/Wheeler* inquiry, the Legislature enacted Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill 3070) to add Code of Civil Procedure section 231.7, which creates new procedures for identifying unlawful discrimination in the use of peremptory challenges."[7] (*Ibid.*, fn. omitted.)

"Under section 231.7, the party objecting to the peremptory challenge is no longer required to make a prima facie showing of racial discrimination. Instead, 'upon objection to the exercise of a peremptory challenge pursuant to [section 231.7],' the party exercising the peremptory challenge must state the reasons for exercising the challenge. (§ 231.7, subd. (c).)" (*Jaime, supra*, 91 Cal.App.5th at p. 943.) The court must "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances." (§ 231.7, subd. (d)(1).)

Further, section 231.7 provides that certain reasons for a peremptory challenge are presumptively invalid unless rebutted by clear and convincing evidence that they are unrelated to the prospective juror's perceived membership in a protected group and that the reasons bear on the juror's ability to be fair and impartial. (§ 231.7, subd. (e).) Presumptively invalid reasons for exercising a peremptory challenge include "[e]xpressing a distrust of or having a negative experience with law enforcement

---

[7]     All further statutory references are to the Code of Civil Procedure.

22

or the criminal legal system" (§ 231.7, subd. (e)(1)), "[e]mployment in a field that is disproportionately occupied by members listed in subdivision (a) or that serves a population disproportionately comprised of members of a group or groups listed in subdivision (a)" (§ 231.7, subd. (e)(10)) and "[l]ack of employment or underemployment of the prospective juror or prospective juror's family member" (§ 231.7, subd. (e)(11)). Certain demeanor-based reasons for excusing jurors are also now presumptively invalid unless independently confirmed by the trial court, and the demeanor "matters to the case to be tried." (§ 231.7, subd. (g).) These reasons include the prospective juror being "inattentive, or staring or failing to make eye contact" (§ 231.7, subd. (g)(1)(A)) or exhibiting "a lack of rapport or problematic attitude, body language, or demeanor" (§ 231.7, subd. (g)(1)(B)).

We review de novo the trial court's denial of an objection under section 231.7, and review the court's express factual findings for substantial evidence. (§ 231.7, subd. (j).) In the absence of express factual findings, we cannot impute any findings to the trial court. (§ 231.7, subd. (j).) Section 231.7 precludes a finding of harmless error, stating, "Should the appellate court determine that the objection was erroneously denied, that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (§ 231.7, subd. (j).)

## II. Forfeiture

We first address the issue of forfeiture. The People argue the only jurors challenged in the trial court were J9442, J5861, and J0955.

23

"In general, the failure to articulate an objection to a peremptory challenge forfeits the issue on appeal." (*Jaime, supra*, 91 Cal.App.5th at p. 946.) When the prosecution excused J9442, defense counsel mentioned the last four peremptories, stating, "I believe the last four jurors the People have kicked have been of Latino, Hispanic descent." The three jurors subject to peremptory challenges preceding J9442 had already been excused. The court noted, "Well, the challenge is focused on [J]9442." Defense counsel responded, "*Correct*." (Italics added.) When invited to argue, counsel stated, "Well, specific to that juror, . . . I don't think he would indicate any answers that showed that he has a bias to either side, that he cannot be a fair and impartial juror in this case. And I decided to exercise the *Batson-Wheeler* after seeing the three previous jurors that the People have kicked as well." However, the court appeared to interpret the challenge as only involving J9442, stating, "As far as the peremptories that were used, I want to make my record that the people's peremptories they have one, two three, four, five before that last one number [J9442] *which is the subject of this inquiry*." (Italics added.)

Defendant argues the full scope of his objection included the previous four jurors, all of whom appeared to be of Hispanic descent. Defendant argues the prosecution understood the full scope of his claim as evidenced by their act of volunteering reasons for excusing all four jurors. However, due to the specific requirements of section 231.7, we find that defendant's express agreement with the court that his first challenge involved only one juror—J9442—constitutes forfeiture as to the previous three jurors who were excused.

Section 231.7 imposes detailed instructions to the court as to its obligations for analyzing each objection to a peremptory challenge. The court must consider only the reasons given and must explain on the record the reasons for its ruling as to each challenge. (§ 231.7, subd. (d)(1).) These statutory procedures make it imperative the objecting attorney make it clear to the court which peremptory challenges are encompassed by an objection. As set forth in more detail below, because section 231.7 requires the court to make specific findings on the record, and this court is not permitted to make any inferences, defendant's purported objections to the People's peremptory challenges to J5432, J9951, J1906 were forfeited in this matter.

## A. *J5432*

The prosecution's third peremptory challenge was used for J5432, a single male to which there was no disagreement he appeared to be of Hispanic descent. He worked as a saw operator and a security guard. He had never served on a jury. He grew up in a neighborhood with gangs, had friends murdered in gang-related violence, and had friends associated with gangs. Although defendant did not object when J5432 was excused from the jury, the prosecutor later explained she felt that due to his feelings about the photograph of the girl in the paint, he might have an issue with circumstantial evidence. That was the reason given as the People exercised a peremptory challenge as to him. The prosecutor also later put on the record her general concern with individuals with no prior jury service. J5432 had no prior jury service, which also weighed into the prosecution's calculation.

Defendant argues the prosecution's position regarding prior jury service was not a legitimate reason in light of the record as a

25

whole. Defendant points out the first two individuals the prosecution excused had both served previously. Lack of jury service was a characteristic that was unique only to the four excused Hispanic jurors. At the time, there were four non-Hispanic jurors seated in the top 12 seats who had never served on juries, none of whom the prosecutors excused at that time. Among the 12 jurors ultimately sworn, nine had not served before.

Section 231.7, subdivision (d)(3)(F) provides a court may consider, among other things, "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record." Another circumstance the court may consider is "[w]hether a reason might be disproportionately associated with a race, ethnicity, . . . or perceived membership in any of those groups." (§ 231.7, subd. (d)(3)(E).) Finally, section 231.7, subdivision (e)(13) provides that a challenge is "presumptively invalid" if the party exercising the challenge uses "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party."

Defendant fails to provide a citation to the record showing defendant pointed to these specific subdivisions of section 231.7 or raised the concern regarding the makeup of the jury and the number of jurors without prior jury service at the time the prosecution noted, for the record, its preference for jurors with jury service.[8]

---

[8] We address this argument concerning lack of prior jury service separately as to J9442 and J5861, *post*.

26

As to the provisions defendant now raises under section 231.7, subdivision (d), the statute provides the court "may" consider such factors in determining whether there is a substantial likelihood an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge. Because the defense did not raise the issue, the trial court had no opportunity to consider it.

As to the provision defendant now raises under section 231.7, subdivision (e), this factor is presumptively invalid, and the party exercising the challenge must "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race[] [or] ethnicity." Because defendant did not raise this provision at trial, the prosecutors had no opportunity to raise clear and convincing evidence to the contrary, and the trial court had no opportunity to evaluate such evidence.[9] Thus, defendant's arguments as to the prosecution's use of lack of prior jury service as an additional factor are forfeited. (*People v. Mills* (2010) 48 Cal.4th 158, 170 ["A party must make a timely and specific objection to the manner in which a trial court conducts jury selection or the matter is forfeited for appeal."]; *Jaime, supra*, 91 Cal.App.5th at p. 946.)

The prosecutor's initial rationale for excusing J5432 was his reaction to the hypothetical concerning the girl and the paint.

---

[9] Defendant argues on appeal the prosecution "did not attempt to meet" the clear and convincing standard of proof. The prosecution and the court were unaware of defendant's argument regarding a disproportionate use of the lack of jury service criteria, thus there was no reason for them to present clear and convincing evidence to the contrary.

The prosecution was concerned J5432 might have an issue with circumstantial evidence, which was an important part of the prosecution's case. Defendant does not argue this rationale was presumptively invalid or otherwise disapproved by section 231.7. However, defendant argues the prosecution's rationale was "contrary to or unsupported by the record." (§ 231.7, subd. (d)(3)(F).) Defendant argues J5432 merely raised a second possibility with respect to the girl in the paint, and his response was in line with the court's instruction on circumstantial evidence.

Again, defendant fails to point to a citation in the record where he argued the prosecution's circumstantial evidence argument was unsupported by the record. While the trial court was permitted to consider the argument defendant now makes (§ 231.7, subd. (d)(3)), in the absence of a clear objection from defendant the court had no reason to perform the analysis or explain the reasons for its ruling on the record, as required by section 231.7, subdivision (d)(1).

Defense counsel expressly agreed his objection was specific to J9442. The prosecution's primary rationale for excusing J5432 was not presumptively invalid; defense counsel failed to raise his arguments under section 231.7, subdivisions (d) and (e); the parties did not elaborate, and the court did not make specific findings as to J5432. Thus, defendant has forfeited his arguments as to J5432.

### B. *J9951*

J9951 was a mental health therapist who had never served on a jury.[10]  Her work was with a nonprofit organization, and it catered to court-mandated clients between the ages of eight and 56 years old.  Through her work, she communicated with attorneys, social workers, probation officers, and the police.  J9951 was arrested in 2012 for driving under the influence.  The matter had been expunged, and she believed she was treated fairly.

The court disagreed that J9951 appeared to be Hispanic, noting J9951's name "doesn't appear to me to be a Hispanic name."  Although defense counsel specified his objection was to J9442, the court permitted the prosecution to put on the record its rationale for excusing J9951.  The prosecutors noted J9951 seemed to be "close to" the criminal justice system and for that reason wasn't a "good fit" for the jury.

Defendant points out the prosecution only asked J9951 two questions.  They asked no questions regarding her contacts with the criminal justice system and how those contacts might impact her decision-making process or affect her interactions with other jurors.  Defendant cites section 231.7, subdivision (d)(3)(C), which permits the trial court to consider "[t]he number and types of questions posed to the prospective juror, including, but not limited to," "[c]onsideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge" (§ 231.7, subd. (d)(3)(C)(i)) and "[w]hether

---

[10]   To the extent defendant's arguments as to lack of prior jury service apply to J9951, defendant has forfeited those arguments by failing to raise them in the trial court, as set forth above.

29

the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror" (§ 231.7, subd. (d)(3)(C)(ii)).  Defendant argues both these subdivisions apply to J9951.  Defendant argues another non-Hispanic juror, a Black male, also had contact with people in the criminal justice system and was not removed.

Had defense counsel made it clear he was objecting to the removal of J9951, and not just J9442, the court could have considered these arguments.  However, defense counsel did not raise these arguments as to J9951, and in fact made it clear the first objection was raised only as to J9442.

Defendant failed to specifically object to J9951's removal.  Defendant did not bring to the court's attention the purported lack of questioning he now raises.  Under the circumstances, the trial court had no opportunity to evaluate the prosecution's reasoning or make a record of the reasons for its ruling, as required by section 231.7, subdivision (d)(1).  The prosecution's rationale for excusing J9951 was not presumptively invalid, and if it were, the prosecution was not given an opportunity to present clear and convincing evidence of objective reasonableness.  Under the circumstances, the defense objection to the People's peremptory challenge as to J9951 is forfeited. (*People v. Mills, supra*, 48 Cal.4th at p. 170; *Jaime, supra*, 91 Cal.App.5th at p. 946.)

### C.    *J1906*

The prosecution's fifth peremptory was used to excuse J1906.  Early in the proceedings, J1906 asked to be relieved from jury service due to financial difficulties.  J1906 worked full time as a staff accountant at a hotel and lived at home, where she paid a share of the rent to her mother.  Her employer only paid for

three days of jury service. J1906 worked in accounting, and her fiancé worked in engineering. J1906 had never served on a jury.[11]

The prosecution pointed to J1906's claim of financial hardship as the reason for their excusal of this juror. The prosecutor noted she expected the evidence to extend for quite some time and did not want somebody on this jury who was going to be concerned with her financial situation more than the evidence in the case. The prosecutor pointed out "she was somebody who responded early in the proceedings to claim that financial hardship in private with the parties." The prosecution later added that J1906 was very soft-spoken and appeared to be someone that would be a "follower," which weighed into the decision to remove her.

Defendant now argues J1906's soft-spoken demeanor is a presumptively invalid reason for excusal. Section 231.7, subdivision (g)(1)(B) provides it is presumptively invalid for a juror to be excused due to "either a lack of rapport or problematic attitude, body language, or demeanor."[12] Section 231.7, subdivision (g)(2) prohibits exclusion of a juror for this reason unless the court "is able to confirm that the asserted behavior occurred, based on the court's own observations or the

---

[11]    To the extent defendant's arguments as to lack of prior jury service apply to J1906, defendant has forfeited those arguments by failing to raise them in the trial court, as set forth above.

[12]    Defendant fails to point to a citation to the record indicating he made any reference to the criteria set forth in section 231.7, subdivision (g)(1)(B) below.

31

observations of counsel for the objecting party."[13]  Further,
"[e]ven with that confirmation, the counsel offering the reason
shall explain why the asserted demeanor, behavior, or manner in
which the prospective juror answered questions matters to the
case to be tried."  (§ 231.7, subd. (g)(2).)  Defendant argues the
prosecution never explained how J1906's demeanor mattered to
the case.

Defendant's present arguments highlight the inequity of
defendant's failure to specifically object to J1906's excusal below.
Had defense counsel specified he was objecting to the removal of
J1906, the prosecutors and the court could have undertaken the
analysis set forth in section 231.7, subdivision (g) surrounding a
juror's problematic demeanor.  However, defense counsel agreed
the challenge was "focused on" J9442, responding "*Correct*" to the
court's specific inquiry.  It is unfair to fault the prosecution for
failing to present the requirements of section 231.7 as to J1906
where defense counsel failed to specify his objection included this
juror.

As to the prosecution's initial rationale for J1906's excusal,
defendant now argues this reason is unsupported by the record
under section 231.7, subdivision (d)(3)(F).  While J1906 initially
inquired about excusal for financial hardship, the court asked her
to see if her employer could give her shifts that did not conflict
with the trial and report back.  At no time did the prosecutor
request that the trial court ask J1906 whether her financial

---

[13]  Although the court did not make a formal record of its
observations of J1906's demeanor, defendant admits when
questioning the juror the court noted that she had "a really low
voice" and indicated more than once that it had trouble hearing
her.

32

concerns had been resolved. Under section 231.7, subdivision (d)(3)(C)(i), defendant argues failure to question a juror about concerns stated in a peremptory challenge can be considered as a potential indicator of bias.

Had defense counsel objected to J1906's removal, these concerns could have been addressed in the first instance in the trial court. In the absence of a timely and specific objection, allowing the prosecution to present its position and allowing the court to make a record, the objection to the peremptory challenge as to J1906 is forfeited. (*People v. Mills, supra*, 48 Cal.4th at p. 170; *Jaime, supra*, 91 Cal.App.5th at p. 946.)

**D.    *Case law cited by defendant***

Defendant argues he did not forfeit his objections to the removal of J5432, J9951, and J1906. He argues a *Batson/Wheeler* objection need not be a "model of clarity." (Citing *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 214 (*Unzueta*).)[14] Defendant argues a colloquy with the trial court is sufficient to preserve the issue where it leaves "no ambiguity as to which peremptory challenges [counsel] identified as racially discriminatory and on what basis." (*Ibid.*) Waiting to object until a "pattern of systematic exclusion" of jurors based on race is "fully manifested" does not render the objection to the challenges comprising that pattern untimely. (*Id.* at p. 215; *People v. McDermott* (2002) 28 Cal.4th 946, 969–970 (*McDermott*).) Defendant points out that defense counsel informed the court he "decided to exercise the *Batson/Wheeler* after seeing the three

_____

[14]    We note the cases cited by defendant regarding forfeiture predate section 231.7 and concern analyses under *Batson/Wheeler*. Defendant has not made any arguments on appeal under the *Batson/Wheeler* standard.

33

previous jurors that the People have kicked as well." In advancing his claim, defendant argues, he repeatedly referred to all four jurors.

Defendant is correct that an objection lodged after counsel has observed a pattern of systemic exclusion is generally not untimely "'if it is made before jury impanelment is completed.'" (*Unzueta, supra*, 42 Cal.App.5th at p. 215.) However, defendant fails to address the portions of the record that reveal the court's understanding—and counsel's explicit confirmation—that the first challenge was "focused on [J]9442." While defendant insists he repeatedly referred to all four jurors, the trial court also repeatedly expressed its understanding that the challenge involved only J9442.

*Unzueta, supra*, 42 Cal.App.5th 199 is distinguishable. In *Unzueta,* the court on its own motion exercised a *Batson/Wheeler* after noting six out of seven of the defendant's peremptories were used to remove Hispanic jurors. On the second day of jury selection, the defense removed four jurors, all of whom were Hispanic. On the third day of jury selection, the defense removed three jurors, two of whom were Hispanic. At that time, the court stated, "'[Defense counsel], the only peremptories you exercised yesterday were against Hispanic jurors. Today you have exercised peremptories against two Hispanic jurors. [¶] I find a prima facie case that you have violated the *Wheeler/Batson* rulings, and you are going to have to justify your peremptories right now.'" (*Unzueta, supra*, at p. 209.) The court expressed its surprise that the plaintiff had not yet made such a challenge. (*Ibid.*) The plaintiff joined the court's motion, stating all the previous day's jurors were excluded because they were Hispanic and there was no other reason for the defense to exclude them.

34

The court stated, "'Well, that water is under the bridge. I'm not going to ask counsel to justify yesterday's peremptories. That is past.'" (*Id.* at p. 210.) The *Unzueta* court found the trial court erred in declining to require the defense to justify its peremptories under those circumstances, finding "[a]lthough [the plaintiff's] articulation of Unzueta's *Batson/Wheeler* challenge was not a model of clarity, [plaintiff's] colloquy with the trial court left no ambiguity as to which peremptory challenges she identified as racially discriminatory and on what basis." (*Id.* at p. 214.) Here, defendant also left no ambiguity that his objection was solely focused on J9442.

Similarly, in *McDermott, supra*, 28 Cal.4th 946, 967, defense counsel "observed that the prosecutor had exercised eight of 20 peremptory challenges against Black prospective jurors and that the jury as constituted did not include any Blacks." Upon hearing the defense's objection, the court "'look[ed] at all the questionnaires of Black jurors who have been excused'" and listened to the prosecution's explanations as to each of those jurors. (*Id.* at p. 968.) Again, the objecting attorney was clear as to the scope of his objection, which included all eight Black jurors who had been excused. Here, defense counsel was clear that his first objection was directed at only one juror—J9442.

The cases cited by defendant do not support his position that his current objections under section 231.7 to the peremptories exercised against J5432, J9951 and J1906 were not forfeited.

### E. *Ineffective assistance of counsel*

For the first time in his reply brief on appeal, defendant argues in the event this court concludes the objections as to J5432, J9951, and J1906 were forfeited, his trial counsel

35

rendered ineffective assistance by failing to provide a more adequate objection. Defendant acknowledges appellate courts will ordinarily not consider new issues raised for the first time in a reply brief. (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275.) However, defendant argues, an issue is deemed not newly raised if it rebuts arguments made by the respondent in respondent's brief. (*Id.* at pp. 275–276.) Defendant argues his ineffective assistance of counsel argument is offered in rebuttal to the People's forfeiture argument.

We disagree with defendant's characterization of the ineffective assistance argument as rebutting the prosecution's forfeiture argument. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) The prosecution has not had the opportunity to address the ineffective assistance of counsel argument, including defendant's arguments that defendant's failure to object was unreasonable, that there was no satisfactory explanation for defendant's failure to object, and that counsel's conduct was prejudicial. We therefore decline to consider it.[15]

---

[15] We note that, as defendant recognizes, had he properly presented his ineffective assistance of counsel claim he would have had to prove that the alleged ineffective assistance was prejudicial. Thus, defendant would have had to show "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Under the circumstances of this case, where the majority of prospective jurors were Hispanic, the jury contained seven Hispanics (including alternates, 12 Hispanics) and the evidence against

**III.  De novo review as to J9442, J5861, and J0955**

    **A.  *Totality of the circumstances***

Upon receiving an objection to a peremptory challenge under section 231.7, subdivision (d)(1), the court must "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances."  In performing our de novo review as to jurors J9442, J5861, and J0955, we first take note of the record the trial court made as to the totality of the circumstances in the courtroom.

The court made some observations as to the racial and ethnic makeup of the parties and courtroom.  The judge was a White male.  Trevizu's counsel appeared to be a White male, and defendant's counsel appeared to be an Asian male.  As to the prosecutors, one appeared to be an Asian female and the other a White female.  One of the prosecutors clarified she was Filipino-Japanese.  The defendants were Hispanic, nearly all of the People's witnesses were Hispanic, and both victims were Hispanic.  There appears to be no reason for the prosecution to excuse Hispanic jurors.  The court emphasized, "this is not a race case."

The court noted the majority of individuals in the courtroom appeared to be Hispanic.  In fact, "Looking out in the audience . . . we have many, many more Hispanic jurors both male and female along with the other races that I can see.  They are too numerous.  I haven't really counted categories."  The court

---

defendant was very strong, it seems unlikely defendant could meet this standard.  However, as set forth above, because the People have not had the opportunity to address this argument, we find defendant has forfeited it.  (*People v. Carrasco* (2014) 59 Cal.4th 924, 990.)

later stated, "the far majority of the folks that are not only sitting on the panel but in the audience waiting to come up are Hispanic. A lot of Compton cases are like that and this case whenever we get a jury and six alternates will be primarily Hispanic, the same ethnic group as the defendants, same ethnic group as the victims in this case."

At the time of defense counsel's first objection, the court noted the prosecution's peremptories included one White, one Black, the third Hispanic, and as to J9951, the court had a question mark, noting J9951's name "doesn't appear to me to be a Hispanic name." The court agreed the prosecution's fifth and sixth peremptories were Hispanic.

The court then reviewed the defense's peremptory challenges. The defense removed a female Hispanic, White male, male Hispanic, Asian female, and male Hispanic. So "three out [of the defense's] five peremptories" were Hispanic. The "overall picture" was that the majority of the prospective jurors in the courtroom were Hispanic, and both sides had used the majority of their peremptories with Hispanics. The majority of the jury was still comprised of Hispanics.

The court noted it was "consistent in today's world in May of 2023 in Compton based on just the demographics of the area . . . it is predominantly Hispanic as is our panel is predominantly Hispanic."

The final jury, not including alternates, had seven Hispanics on it. Including the alternates, there were 12 Hispanics, two Whites, one Asian, and three Blacks.

Defendant acknowledges the statutorily listed "circumstances the court may consider" unrelated to the prospective jurors do not appear to weigh in favor of a finding of

38

discrimination when viewed collectively.[16] Defendant also asserts such circumstances do not weigh against a finding of discrimination.

We evaluate the reasons given to justify the peremptory challenges in light of the totality of circumstances present in the courtroom at the time. (§ 231.7, subd. (d)(1).) We note that where, as here, the vast majority of individuals in the courtroom, including the prospective jurors, defendants, victims, and witnesses—all appeared to be of Hispanic ethnicity, it logically follows that the majority of peremptory challenges would be Hispanic individuals.

**B.** *J9442*

The People justified their removal of J9442 due to his lack of life experience. The prosecutor explained, "He indicated that he works in a food prep place. He is single. He has no kids. He has no hobbies. He indicated that he watches TV most of the time. Given the charges in this case and how serious [*sic*] we expect people to understand the relationships between everyone, I didn't feel he was an appropriate juror for this particular case notwithstanding his age." The People later noted that he, among others excused by the prosecution, lacked jury experience.

---

[16] Among the circumstances a court may consider are "(i) The objecting party is a member of the same perceived cognizable group as the challenged juror. [¶] (ii) The alleged victim is not a member of that perceived cognizable group. [¶] (iii) Witnesses or the parties are not members of that perceived cognizable group." (§ 231.7, subd. (d)(3)(A).) The court may also consider "[w]hether race, ethnicity . . . or perceived membership in any of those groups, bear on the facts of the case to be tried." (§ 231.7, subd. (d)(3)(B).)

Defendant relies on *People v. Uriostegui* (2024) 101 Cal.App.5th 271 (*Uriostegui*), to argue the prosecution's lack of life experience rationale was improper. In *Uriostegui*, the prosecutor exercised a peremptory challenge against a Hispanic juror "'based [on] lack of life experience.'" (*Id.* at p. 276.) When asked to elaborate, the prosecutor noted the prospective juror was not currently working, had no children, had limited ties to her community, and was very malleable in terms of her answers to questions. The prosecutor noted she was "'reluctant, timid, malleable,'" and soft-spoken. (*Ibid.*) The defense counsel countered that the prosecution's "demeanor-based" objections were presumptively invalid, noting the juror seemed to be paying attention and her answers were logical. (*Id.* at p. 277.)

The *Uriostegui* court agreed that "the prosecutor's specific reasons" supporting the prospective juror's alleged lack of life experience were, in fact, presumptively invalid. (*Uriostegui, supra*, 101 Cal.App.5th at p. 277.) Presumptively invalid reasons included a prospective juror's lack of employment or underemployment, as well as certain demeanor-based reasons. Because the prosecution's reasons for excusing the juror were presumptively invalid, the trial court erred by failing to find that her employment status, or her demeanor, bore on her ability to be fair and impartial in the case. (*Id.* at p. 280.) Further, reasons surrounding the juror's demeanor had to be independently confirmed by the trial court, which the trial court did not do. (*Ibid.*) Under those circumstances, the case was reversed and remanded for a new trial. (*Id.* at p. 282.)

The situation before us is different. J9442 was not unemployed. He worked in food preparation for a private company. Thus, the concern regarding lack of employment or

underemployment is not existent in this case. In addition, the prosecution did not state reasons having to do with J9442's demeanor. Instead, they noted his lack of interests, hobbies, or involvement with the community. He had no roommates and spent his time watching television, mostly cartoons.[17]

Lack of life experience is not a presumptively invalid reason for exclusion of a juror under section 231.7. In *Uriostegui*, the concern was that the phrase "lack of life experience" was used to mask underlying concerns that were presumptively invalid— i.e., lack of employment and demeanor. That is not the case here.

We consider the prosecution's reasons for excusing J9442 in light of the totality of circumstances. We decline to speculate or assume the existence of other possible justifications for the discharge of J9442. (§ 231.7, subds. (d)(1) & (j).) We find there is no substantial likelihood that an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge as to J9442.

**C.    *J5861***

J5861 was a female who asked early in the proceedings to be excused from service. She worked one-on-one as an instructional assistant for a special needs student. She was required to be with her student "all the time" and it would be strange for her student to be without her. J5861 lived in Paramount, was divorced, and had no children. Her ex-husband was an electrician. She had never served on a jury before. The

---

[17]    The court noted it was defense counsel who asked J9442 about his interests. Defense counsel also seemed perplexed at J9442's lack of life experience, as the court noted, "Even once replying, well, what else do you do? He watches cartoons."

41

prosecution estimated her age at 32. The prosecutor explained her rationale as follows:

"[S]he was somebody that we had excluded from the jury because of what she brought to the court's attention yesterday or in our days prior. She indicated she is an instructional assistant to middle school children and in particular special ed students or those with special needs.

"She was talking about how her classes are in going [*sic*] testing right now. This is something that I'm keenly aware of because my children are undergoing state testing right now and it's kind of a big deal. And since her kids were the kids that she said needed her assistance, it was our thinking that her mind would also not be in this case.

"I know that is not a good enough reason for the court. However, it is something we take very seriously only because there is going to be very nuanced types of evidence in this case and we need them to be concerned about that and have no worries about what's going on outside of this courtroom when we are presenting our evidence so that was our concern there."

The court noted it could not determine whether J5861 was Hispanic or not but had made a notation she was an Asian female. However, the court noted its reasoning was the same, stating, "I don't think there is very much likelihood at all that an objective reasonable person would view the membership in a protected group as a factor in the use of the peremptory challenges because challenges are being made by both sides with not only that ethnic group, but all the others. And this jury will ultimately be comprised just based on its make-up of Hispanics. So for those reasons the motion is denied." The court declined defense counsel's invitation to ask the juror her race, stating, "I'm

not going to do that only because it won't make a difference to my ruling."

Defendant takes issue with the prosecution's rationale, arguing the school could cover for J5861, and she would get paid for jury service. In addition, defendant points out, there would be dark days in court and J5861 could inform her school of those dates. Defendant's counterarguments do not convince us that an objectively reasonable person would find race or ethnicity to be a factor in J5861's excusal.[18]

Defendant argues the prosecution never asked J5861 about her ability to focus on the case. Section 231.7, subdivision (d)(3)(C)(i) provides that in determining whether a peremptory strike is based on race or ethnicity, a court may consider "whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge." While we are permitted to consider this factor under section 231.7, subdivision (d)(3)(C)(i), we find in this case it does not lead to a conclusion that an objectively reasonable person would view race as the true underlying reason for J5861's excusal.

We consider the prosecution's reasons for excusing J5861 in light of the totality of circumstances. The prosecutors expressed concern that J5861 would be worried about her special needs student, and this distraction would interfere with her ability to

---

[18] We reject defendant's suggestion that the reasons given by the prosecution were "contrary to or unsupported by the record." (§ 231.7, subd. (d)(3)(F).) J5861 specifically asked to be excused due to a hardship concerning her work with a special needs student. The record shows her mind was on her work commitments from the very start of jury selection.

focus on the complex facts of the case. This is not a presumptively invalid reason and is supported by the record. We find there is no substantial likelihood that an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge as to J5861.

**D.    *J0955***

J0955 was a single female who informed the court early on she could not commit to the time required for the trial due to a financial hardship. She just started a new job, had a "huge debt-collector issue," and the new job was nine to five. J0955 had previously served on a jury in a civil trial, which reached a verdict. J0955 went to a Black Lives Matter protest and got slammed against a police car for peaceful protesting, which was a negative experience. She suffered bruises, and the police involved were from the Los Angeles Police Department. However, she believed she could be impartial. J0955 had been to other Black Lives Matter protests, as well as protests about reclaiming indigenous lands.

Following the defense's objection, the prosecution noted J0955 came forward to identify herself as someone who was going to have a financial hardship. The prosecutors were "concerned about . . . keeping her attention on the case because of the fact that she had those kind of hardships going on." In response to defense counsel's argument that J0955 participated in a Black Lives Matter protest and had a negative experience with law enforcement, the prosecutor stated, "We didn't question her in regards to the Black Lives Matter because none of those things really were at issue with us. We are fine with that. But just the fact that she identified herself as someone who would have a hard time serving on this jury was the reason." When the court

characterized the prosecution's exclusion of J0955 as an exclusion for "inconvenience," the prosecutor explained further:

"I think it goes a step further and it's not just an inconvenience. When someone singles themselves out to address the court and to remain in order to address the court, it signals to me that that is something that is a significant enough concern to her.

"Also, she indicated, you know, she is a freelance photographer. [S]he just got a new job. And I am mindful of the fact that when people arrive here at jury service, they don't expect to be given a case that is going to be over a month long.

"And so when she came here, said she just got a new job and also was concerned about financial hardship especially in light of this large debt, that is concerning to me only because not that I am trying to do her a favor, but our particular case has a lot of nuances. It has a lot of circumstantial evidence. And it's something that requires a large amount of attention."

The prosecutor specified she was concerned J0955's attention would not be on the case because "she is worried about this other situation of not being at work while she is here." The prosecutor noted there were "still . . . four young Hispanic females in the same demographic" as J0955 on the jury that the prosecution had "not endeavored to kick and have every intention actually of keeping on." She further noted, given the number of Hispanic names of the remaining jurors, "even if we were trying to dismiss young Hispanic jurors, we would not be able to do that."

Defendant argues the record does not support the prosecution's claimed reason for excusing J0955. After she raised her concern, the court advised her to talk to her employer about

whether she could be paid for jury service or arrange a schedule that would enable her to work without losing work hours. The court asked her to report back with any further issues. J0955 never reported back.

Further, defendant points out the prosecutors never asked J0955 about her hardship issue. Defendant points out under section 231.7, subdivision (d)(3)(C)(ii), cursory questioning of a juror is one of the factors the court can consider in determining whether a juror has been excused based on race or ethnicity.

Defendant's arguments do not suggest a substantial likelihood that an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge. The prosecutors consistently removed individuals whom they felt would not be focused on the case or would be distracted by their personal or financial concerns. The record supports this rationale. Although the prosecution never followed up with J0955 regarding her financial concerns, her situation was unlikely to change within the days that passed during jury selection. The prosecution's reasoning was not presumptively invalid, and although we have considered defendant's arguments, they do not convince us that section 231.7 was violated in this case.

We consider the prosecution's reasons for excusing J0955 in light of the totality of circumstances. The prosecutors expressed concern that J0955 would be distracted by her financial and work situation, which was a concern given the complexity of the case. This is not a presumptively invalid reason, and is supported by the record. Given the demographics of the court, which were repeatedly described on the record, both parties' exclusion of Hispanic jurors, and the number of Hispanic jurors left on the

46

jury after jury selection, we find there is no substantial likelihood that an objectively reasonable person would view race or ethnicity as a factor in the use of the peremptory challenge as to J0955.

## IV. Lack of prior jury service

Following arguments regarding jurors J9442 and J5861, the prosecution asked to supplement the record regarding its reasons for removing the previous six jurors. The court allowed the prosecution to do so. At that time, the prosecutors noted, as a supplemental reason, "the last six of our peremptories were exercised on folks who did not have prior jury experience. That always weighs into the calculation as well."[19] We note this was not the primary reason the prosecutors articulated as to the jurors' removal, but appeared to be an additional, lesser consideration.

As set forth in detail above, defendant argues the prosecution was wrong. Defendant states the first two individuals subject to peremptories exercised by the prosecution had served on juries before. Thus, defendant argues, the lack of jury service rationale was used only for removal of Hispanic jurors. Among the 12 jurors ultimately sworn, nine had not served before.

Defendant argues the prosecution's position regarding prior jury service was not a legitimate reason in light of the record as a whole. Defendant argues this reason presented a violation of section 231.7, subdivision (d)(3)(F) (court may consider, among other things, "Whether the reason given by the party exercising

---

[19] This rationale did not apply to J0955, who had previously served on a jury, therefore it is only relevant to J9442 and J5861.

47

the peremptory challenge was contrary to or unsupported by the record"); section 231.7, subdivision (d)(3)(E) ("[w]hether a reason might be disproportionately associated with a race, ethnicity, . . . or perceived membership in any of those groups); and section 231.7, subdivision (e)(13) (a challenge is "presumptively invalid" if the party exercising the challenge uses "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party").

Pursuant to section 231.7, subdivisions (d)(3)(E) & (F), we may consider whether the reason given by the party was contrary to or unsupported by the record or disproportionately associated with race or ethnicity. We consider defendant's arguments and conclude that the prosecution's secondary rationale for excusing these jurors would not cause an objectively reasonable person to view race or ethnicity as a factor in the use of the peremptory challenge. Although the prosecutors raised this rationale to make a complete record, it does not appear that they ever relied on it again in justifying their removal of J9442 or J5861. Further, it was not their primary reason as to either of these jurors. In the prosecutor's own words, lack of prior jury service was something that "weigh[ed] into the calculation," but was not asserted as the primary reason for those jurors' dismissals.

Under section 231.7, subdivision (e)(13), a challenge is "presumptively invalid" if the party exercising the challenge uses "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party." Here,

48

defendant points out that at the time of the defense objection, there were four non-Hispanic jurors seated in the top 12 seats who had never served on juries, and the prosecution did not excuse them. Therefore, the prosecutor's justification of lack of prior jury service applied only to Hispanic jurors.

A peremptory challenge for any reason stated under section 231.7, subdivision (e) is presumptively invalid "unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's" race or ethnicity. As set forth above, the prosecution's challenges to J9442 and J5861 were not specifically justified by their lack of prior jury service. Instead, J9442 was dismissed for lack of life experience, and J5861 was dismissed due to her concerns about her job. At no time during the arguments concerning these jurors did the prosecution specifically raise the lack of jury service rationale. It was a secondary rationale that was stated on the record but never repeated. As set forth above, the prosecution's primary rationales for these two jurors were not presumptively invalid and would not lead an objectively reasonable person to believe race or ethnicity to be the true reason for their removals. Given the complicated factual scenario and abundant circumstantial evidence, the reasons the prosecution articulated were related to the prospective jurors' ability to be fair in the case.

Further, as the prosecution noted, given the totality of the circumstances, clear and convincing evidence existed that an objectively reasonable person would not view the rationale as related to these jurors' race or ethnicity. The vast majority of prospective jurors in the courtroom were Hispanic, and the jury

49

was majority Hispanic.  Under the circumstances, we find an objectively reasonable person would not view the prosecution's rationale as related to these prospective jurors' race or ethnicity.

## DISPOSITION

The judgment is affirmed.


                                        CHAVEZ, J.


We concur:


LUI, P. J.


RICHARDSON, J.